277 N.J. Super. 378 (1994)
649 A.2d 913
CHRIS E. BLEUMER, PLAINTIFF,
v.
PARKWAY INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY AND RAYMOND BARRETTE, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided July 22, 1994.
*382 Bruce P. McMoran for plaintiff (Clapp & Eisenberg, P.A., attorneys).
Dana W. Garland for defendants (Grotta, Glassman & Hoffman, P.A., attorneys).
SCHWARTZ, J.S.C.
This case raises for the first time since the decision of the Supreme Court in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) whether a claim under the Conscientious Employee Protection Act. (CEPA), N.J.S.A. 34:19-1 to 34:19-8, commonly known as the whistleblower statute, is subject to arbitration under an arbitration clause in a private employment agreement and if so, whether the arbitration clause in this case is broad enough to require arbitration under the Federal Arbitration Act, 9 U.S.C.A. §§ 1 to 15, of plaintiff's CEPA claim. Defendants have moved to stay this action and to compel arbitration of the CEPA claim.

I. THE FACTS

Based on the allegations of the complaint, the certification of John A. Ricca, assistant vice president and assistant general counsel of defendant, Fireman's Fund Insurance Company (FFIC), and the exhibits attached to Mr. Ricca's certification, with all inferences being drawn most favorably to plaintiff as must be done on a motion of this nature, the facts appear to be as set forth below.

A. Background

FFIC is a national property, liability and accident insurer headquartered in California with offices across the country. Defendant, Parkway Insurance Company (Parkway) was originally *383 established as of New Jersey (FFNJ) in 1983 and changed its name to Parkway in 1992.
Pursuant to a consent order between FFIC and the New Jersey Commissioner of Insurance (the Commissioner) dated July 29, 1991 and consented by various subsidiaries of FFIC licensed in New Jersey, FFIC and each of its subsidiaries were authorized to transfer their private passenger automobile business in New Jersey to FFNJ and to withdraw from that line of insurance subject to certain conditions. These conditions included, among others, requirements that Fireman's Fund transfer to FFNJ assets sufficient to bring the total capital and surplus of FFNJ to $25 million and that FFIC deposit $6 million into an escrow account for a two year period, at the conclusion of which FFIC would be permitted to withdraw that part of the sum held in escrow which would not cause the net premium-to-surplus ratio of FFNJ to exceed 3 to 1. The consent order imposes certain maximum ratios of acquisition expenses, general expenses and variable expenses to earned premium of FFNJ in each calendar year through 1996 as a condition for FFIC not being required by the New Jersey Department of Insurance (NJDOI) to make additional capital contributions to FFNJ. The consent order defines each such category of expense and establishes a formula for additional capital contributions by FFIC to FFNJ should any of the categories of expense exceed earned premium of FFNJ in any calendar year between 1991 and 1996.
The consent order authorized FFIC and each of its subsidiaries then selling private passenger automobile insurance in New Jersey to mail notices to their policyholders informing them that they would not be renewing their policies on expiration and that FFNJ would be offering to renew such policies. FFNJ was required to renew all currently written private passenger automobile policies on their anniversary dates except to the extent that non-renewal was permitted by statute, regulation or the terms of the consent order.
*384 FFIC and each of its subsidiaries were required to deposit $500,000 with the Commissioner to guarantee that they would satisfy their liabilities to New Jersey policyholders, claimants and creditors, but the Commissioner is required to return those deposits if satisfied that the companies have complied with all the provisions of the consent order.

B. Plaintiff's Hiring and Termination

On or about May 30, 1991, about two months before execution of the aforesaid consent order, defendant, Raymond Barrette ("Barrette"), who was then chief financial officer of FFIC and president of its Personnel Insurance Division, contacted plaintiff and recruited him to become president and chief executive officer of FFNJ under a five year employment contract. Plaintiff informed Barrette he would not take the position with FFNJ unless he could get FFIC's support to make FFNJ a successful independent entity for later sale, and Barrette agreed.
A written employment agreement (hereinafter "the contract") between FFIC and plaintiff was executed on August 2, 1991 pursuant to which plaintiff agreed to serve approximately 5-1/2 years from July 15, 1991 to December 31, 1996 as president and chief executive officer of FFNJ. A copy of the consent order was provided to plaintiff and its general purpose summarized in the contract. In that connection the contract stated that the goal of FFIC was the consolidation of all its New Jersey private passenger automobile insurance business into FFNJ by April 1992. FFIC committed itself to provide any services required by FFNJ to meet operating needs. The contract further stated that the mission of FFNJ was to operate as a regional company within New Jersey so as to preserve FFIC's investment and to ultimately extract FFIC and its subsidiaries from the New Jersey private passenger automobile insurance market through an approved withdrawal plan or the sale of FFNJ. The contract also provided that FFNJ would change its name to Parkway.
*385 Plaintiff's duties are detailed in the contract and include setting up the New Jersey office of FFNJ, hiring staff, creating benefit plans, contracting with outside vendors, developing and implementing a marketing plan and developing a good working relationship with the NJDOI. Although the contract provides that plaintiff is to have significant autonomy in managing the day to day operations of FFNJ, he was required by its terms to report to FFNJ's board chairman, whose approval was required for all major decisions. The only major decisions for which such approval was specifically required under the contract were creation of benefit plans, employment of senior executives and the terms and conditions of their employment.
The contract fixes plaintiff's annual salary, describes his benefit package and sets forth a detailed procedure for calculating and paying plaintiff a bonus and an additional bonus upon the sale of FFNJ or its withdrawal from the New Jersey private passenger automobile insurance market on or before December 31, 1996.
The contract contains detailed provisions for termination of plaintiff's employment with FFNJ for cause, for disability and without cause. The contract defines the three types of termination and describes the severance pay to which plaintiff will be entitled in the event of termination for cause, for disability or without cause. The contract provides for substantially less severance pay if plaintiff is terminated for cause than if he is terminated without cause. Section 13 of the contract contains a number of miscellaneous provisions, among which are a clause providing for arbitration of any disputes between the parties "regarding the agreement," and a provision allowing FFIC to assign the employment contract to any of its affiliates or their successors so long as FFIC agrees to also remain obligated to plaintiff under the agreement. On or about December 31, 1991 FFIC assigned this contract to FFNJ.
In order to perform his duties plaintiff was required to relocate to New Jersey from California, where he resided when the contract was signed. Plaintiff asserts that by August 1992 he had *386 succeeded in establishing a New Jersey presence for Parkway, had improved relations with the NJDOI, had largely corrected past violations of the Fair Act[1] by FFIC, had brought Parkway into compliance with the Fair Act, had improved the financial position of Parkway and had created a foundation for Parkway to succeed as an independent entity.
On January 13, 1993 plaintiff was suspended when Barrette initiated a "confidential investigation" of Parkway. On January 15, 1993 Barrette removed the investigators and reinstated plaintiff. On January 28, 1993 plaintiff was again suspended. On February 2, 1993 Barrette terminated plaintiff without cause. On February 3, 1993 Barrette asked plaintiff to perform consulting services for Parkway, which plaintiff agreed to do until April 1993. By letter dated March 19, 1993, signed by both Barrette as chairman of the board of directors of Parkway and by John E. Meyer as executive vice president and chief financial officer of FFIC, plaintiff was formally notified that his employment with Parkway was terminated without cause effective April 1, 1993; that effective immediately, he was no longer authorized to act on behalf of Parkway, and that he was no longer to report to his office; that he would be employed at his current salary and benefits through March 31, 1993 and that he would thereafter be paid one year's salary, less applicable withholdings and deductions. The one year's salary represented the severance pay required pursuant to the termination without cause provisions of the contract.

C. Summary of CEPA Allegations

Plaintiff alleges that, from the outset, Barrette and FFIC engaged in a pattern of wrongful and fraudulent conduct, pursuant to a scheme to defraud the NJDOI, by seeking to avoid compliance with the requirements of the consent order regarding additional capital funding of Parkway by FFIC and by extracting the *387 maximum dividend from Parkway based upon submitting knowingly false financial information to the NJDOI. Plaintiff contends that in furtherance of the scheme to defraud the NJDOI, defendants instructed plaintiff to falsely interpret the consent order to the detriment of Parkway and to submit false financial statements to the NJDOI, and when plaintiff refused, he was terminated; that such termination was malicious and in retaliation for his protests; and that defendants violated CEPA, causing him to suffer damages.
The complaint alleges the following acts in furtherance of the defendants' alleged scheme to defraud the NJDOI: Following the third quarter of 1992 plaintiff reported to Barrette that an estimated $2 million capital funding requirement from FFIC to Parkway would be required at the end of 1992 pursuant to the consent order. Barrette directed plaintiff to reduce this amount. In December 1992, Barrette and others allegedly suggested illegal methods of reducing the capital infusion obligation, including falsely reporting commission expense to the NJDOI in Parkway's financial statements as a percentage of earned premium rather than written premium. Plaintiff refused to participate in the issuance of such false financial reports.
In January 1993 plaintiff became aware that Parkway would be notified of an assessment of Market Transition Facility (MTF) operating deficits. Plaintiff received notice from NJDOI as to the required method of recording the assessments in its financial statements. Parkway was told it "shall record" a portion of the assessment and "may record" another portion as a liability in Parkway's financial statements. Plaintiff calculated Parkway's "shall record" assessment at $5.4 million and its "may record" assessment at $5.7 million. Plaintiff further determined both amounts as material to Parkway's financial statements as of December 31, 1992. On or about January 22, 1993 plaintiff notified both Barrette and Richard Warren, FFIC Controller, of these developments and provided documentation to them.
*388 Barrette stated that he did not want to list either assessment in the December 31, 1992 financial statements. Plaintiff told Barrette that the "shall record" assessment at March 31, 1993 would eliminate any possibility of extracting the dividend under the consent order. Barrette then ordered plaintiff to come up with a way to improve surplus on the financial statements. Barrette told plaintiff not to rule out altering existing contracts so as to show improved surplus at March 31, 1993. Plaintiff protested that this would be illegal and improper.
Plaintiff was then informed that Parkway's 1992 year end financial statements would not reflect the MTF "shall record" assessment, that the "shall record" assessment would be reported in Parkway's financials at March 31, 1993 and that the assessment would reduce surplus. Plaintiff was instructed not to discuss with or disclose this matter to Parkway's independent auditors. Shortly thereafter, Barrette suspended plaintiff and ordered Parkway executives to avoid any contact with him.
Plaintiff contends that after his termination, Barrette instructed that schedules produced by FFIC's accounting department indicating a $925,000 FFIC obligation be discontinued. Subsequent to a February 11, 1993 FFIC board meeting, FFIC's payment obligation under the consent order was further reduced by almost 90% to less than $30,000.
Barrette allegedly directed Parkway staff to approach contract service providers to alter existing contracts for the sole purpose of transferring liabilities on the books at March 31, 1993 to a future date so as to falsely inflate surplus. One contract provider was allegedly asked to consider forgiveness of about two million dollars owed to it for services rendered to Parkway prior to March 31, 1993 in consideration for increasing its service fee reimbursement for those services after March 31, 1993.
Barrette also allegedly directed that a portion of Parkway's books be closed early in March 1993, resulting in less than one year's written premium being reported. Barrette then allegedly ordered false adjustments to the March 31, 1993 Parkway financial *389 statements to drastically reduce reported loss reserves and artificially inflate surplus. Barrette also directed that the "shall record" portion of the MTF assessment be reduced and falsely reported as losses, thereby disguising the loss reserve adjustment so as to inflate surplus. It is alleged that Parkway then fraudulently applied to the NJDOI for a return to FFIC of nearly $5.5 million of Parkway's capital based on these allegedly false adjustments to Parkway's financial statements for March 31, 1993.

II. The Legal Issues

A. Applicability of Federal Arbitration Act

Defendants assert that their right to arbitration of the CEPA claim is governed by the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1-15. Section 2 of the FAA requires enforcement of "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitrating a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... save upon such grounds as exist at law or equity for the revocation of any contract." Section 1 of the FAA defines the term "commerce" as "... commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees or any other class of workers engaged in foreign or interstate commerce."
Plaintiff disputes the applicability of the FAA, asserting that plaintiff's employment contract involved intrastate commerce exclusively conducted in New Jersey, rather than interstate commerce within the meaning of section 1 of the FAA. Plaintiff argues that the intrastate character of the employment agreement is evidenced by the facts that he is a New Jersey resident; that Parkway is a New Jersey corporation; that Parkway was formed to separate and insulate FFIC's private passenger automobile *390 insurance business in New Jersey from that of any other state; and that plaintiff's employment with Parkway allegedly was purely intrastate.
The issue of whether an arbitration agreement relates to interstate commerce so that it is covered by the FAA is governed by Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). In Bernhardt plaintiff sought to invoke the arbitration act with respect to an employment contract entered into in New York, but which was to be performed in Vermont. The court held that the FAA did not apply because the contract did not evidence "a transaction involving commerce." The Court's finding was based upon the absence of any proof demonstrating that plaintiff "... while performing his duties under the employment contract was working `in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce, ..." 350 U.S. at 200-201, 76 S.Ct. at 275, 100 L.Ed. at 204.
In analyzing whether plaintiff in this case was either working in commerce or engaging in activity which affects commerce, reference must be made to his contract with Parkway. Plaintiff was given "... a significant amount of autonomy to manage the day-to-day operations of FFNJ." (Section 2 of the contract). He was also given express authority by its terms to "contract with outside vendors for services."
Defendants correctly argue that in selling private passenger automobile insurance to New Jersey residents, Parkway, which was under plaintiff's day-to-day management and control, was of necessity engaged in activities involving or affecting interstate commerce whenever its policyholders became involved in accidents outside New Jersey. Employees of Parkway, either under plaintiff's supervision and/or in accordance with policies and procedures promulgated or approved by plaintiff, would be required to retain out-of-state claims adjusters, investigators and/or attorneys to investigate such accidents, to adjust claims or defend suits arising out of such accidents, to authorize settlement of such claims, to pay judgments and to authorize appeals from adverse jury verdicts. *391 Plaintiff's employment agreement clearly contemplates his supervision at least to some extent of such activities by subordinate employees of Parkway and the promulgation or approval of company policies and procedures pertinent thereto. Accordingly, this court concludes that plaintiff's duties under his employment agreement with Parkway, at least to some extent, involve or affect interstate commerce and that defendants' right to arbitration of the CEPA claim is governed by the FAA.[2]

B. Arbitrability of the CEPA Claim under the FAA

Relying upon Lepore v. National Tool and Mfg. Co., 224 N.J. Super. 463, 540 A.2d 1296 (App.Div. 1988), aff'd. 115 N.J. 226, *392 557 A.2d 1371 (1989), cert. den. 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 353 (1989) and Labib v. Younan, 755 F. Supp. 125 (D.N.J. 1991), plaintiff argues that retaliatory discharge claims, including those arising under CEPA, are not subject to compulsory arbitration. Defendants counter that, in view of the Supreme Court's opinion in Gilmer, the Lepore case must be read to apply only to employees working under collective bargaining agreements containing arbitration clauses, and that under Gilmer employees subject to individual employment agreements containing broadly worded arbitration clauses are required to submit all statutory claims, including a CEPA claim, to binding arbitration. Defendant further argues that Labib v. Younan, supra, having been decided before Gilmer, has been effectively overruled by Gilmer to the extent at least that Judge Gerry held that there was no reason to distinguish an individual employment agreement from a collective bargaining agreement in determining whether a statutory discrimination claim was arbitrable.
In Lepore a union employee brought a common law tort claim against his former employer for retaliatory discharge for reporting workplace safety violations to the Occupational Safety and Health Administration. Defendant argued that such claims were preempted by section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185 (LMRA) and the Occupational Safety and Health Act, 29 U.S.C.A. §§ 651-678 (OSHA). Summary judgment was entered dismissing plaintiff's state common law tort claim. In reversing, the Appellate Division held:
We hold that an employee under a collective bargaining agreement may seek redress in our courts for a discharge in retaliation for reporting workplace safety violations. We further hold that a tort remedy for such retaliatory discharge was not preempted by either LMRA or OSHA.
[224 N.J. Super. at 466, 540 A.2d 1296.]
Although CEPA was enacted after the retaliatory discharge in Lepore and therefore was not directly applicable to plaintiff's claim in that case, the Lepore court recognized that the word "employee" was broadly defined under N.J.S.A. 34:19-2(b) as "encompassing both union and nonunion employees" and stated *393 that "... we view this legislation as a reaffirmation of this state's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge." Id. at 470, 540 A.2d 1296.
The Lepore court, although recognizing the public policy favoring binding arbitration, relied upon a body of United States Supreme Court case law allowing vindication in the courts by union employees, despite arbitration clauses in collective bargaining contracts, of certain statutory rights which the court found analogous to the rights being advanced by plaintiff. The Lepore court reasoned:
It is, thus, not surprising that the policy in favor of binding arbitration has not precluded judicial recourse for certain allegations of illegal conduct by an employer. McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (violations of civil rights); Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (racial discrimination) Barrentine v. Arkansas Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (violation of the Fair Labor Standards Act). See also Atchison, Topeka and Santa Fe Railway Co. v. Buell, 480 U.S. [557], 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) (violations of Federal Employees' Liability Act). These cases focus upon the nature of the rights being vindicated through the judicial remedy. Because they are substantive non-waivable rights of all workers, separate and distinct from rights created by the collective bargaining agreement, judicial recourse is permitted notwithstanding the existence of binding arbitration. Cf. Thornton v. Potamkin Chevrolet, supra, 94 N.J. [1] at 5 [462 A.2d 133] (1983) (arbitration under collective bargaining agreement for alleged racially motivated layoff does not bar administrative complaint with the Division of Civil Rights).
We think the same considerations pertain to the right of a worker in our state to a safe and healthy workplace and the corresponding right to be free from retaliatory action therefore. These rights do not derive from the bargaining process. Firmly grounded in statute and public policy, they are rights applicable to all workers. Resolution of alleged employer misconduct in violation of these rights does not, moreover, implicate any "private law" of the parties to the contract or "considerations which are foreign to the competence of the courts." Rather the trial would simply consist of plaintiff's establishing a prima facie case that he was in fact fired for filing OSHA complaints and National would then have to demonstrate he was fired for another, non-pretextual reason.
[224 N.J. Super. at 472-473, 540 A.2d 1296.]
*394 In Labib v. Younan, supra, plaintiff was employed as a doctor in defendant's anesthesia practice pursuant to the terms of an individual employment agreement which contained a clause requiring arbitration of "[a]ny controversies or disagreements arising out of, or relating to, this agreement or breach thereof." 755 F. Supp. at 126. Plaintiff asserted a claim under CEPA for retaliatory discharge by defendant for his reporting to the defendant and officials at Shore Memorial Hospital that he was aware of allegedly improper Medicare and insurance reimbursement practices. In determining arbitrability of the CEPA claim, Judge Gerry applied state law, rather than the FAA, "[b]ecause the contract in the instant case does not relate to maritime activities or interstate or foreign commerce." Id. at 127. In so doing, Judge Gerry nevertheless concluded that New Jersey public policy favors arbitration and "mirrors federal arbitration policy" Ibid.
Although concluding that the arbitration clause was written broadly enough to encompass any claims arising out of termination of the employment relationship, including plaintiff's CEPA claim, the court in Labib found that "... the strong public policy against retaliatory discharge weighs against the general policy in favor of arbitration" and compelled the court to refuse to stay proceedings concerning the CEPA claim. Id. at 129. In so holding, the court relied on a number of New Jersey cases, including Lepore, which "... emphasized the importance of judicial adjudication of claims alleging retaliatory discharge from employment, even where the plaintiff is covered under an existing employment agreement containing a binding arbitration provision." Ibid.
The court also referred to Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). That case permitted an employee subject to an arbitration clause in a collective bargaining agreement to proceed in court with a tort claim under state law for retaliatory discharge for filing of a worker's compensation claim. Judge Gerry reasoned that "[a]lthough these cases involved collective bargaining agreements and therefore discussed potential preemption of state claims by § 301 *395 of the federal Labor Management Relations Act of 1947, 29 U.S.C.A. § 185, we see no reason not to apply the same analysis to any individual employment agreement." Labib, 755 F. Supp. at 130.
In Gilmer, which was decided about five months after Labib, the Supreme Court regarded the distinction between private contracts and collective bargaining contracts crucial in weighing the rights of the parties to seek judicial enforcement of statutory claims despite the presence of contract clauses providing for binding arbitration.
In Gilmer plaintiff sought federal court adjudication of a claim arising under the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621-634. Plaintiff, as required by his employment as manager of financial services with defendant, registered as a securities representative with several stock exchanges including the New York Stock Exchange (NYSE). His registration application provided, among other things, that he "agreed to arbitrate any dispute, claim or controversy" arising between him and defendant "that is required to be arbitrated under the rules, constitutions or by laws of the organizations with which I register." 500 U.S. at 23, 111 S.Ct. at 1650, 114 L.Ed.2d at 35. NYSE Rule 347 required arbitration of "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative." Ibid.
Defendant sought to compel arbitration of plaintiff's ADEA claim. The District Court denied defendant's motion, but the Fourth Circuit reversed. The Gilmer majority defined the plaintiff's burden of proof to avoid enforcement of a contract provision for arbitration which is sufficiently broad to encompass statutory claims as follows:
Although all statutory claims may not bez appropriate for arbitration, "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Ibid. In this regard, we note that the burden is on Gilmer to show that Congress amended to preclude a waiver of a judicial forum for ADEA *396 claims. See [Shearson/American Express Inc., v.] McMahon, 482 U.S., [220] at 227 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987)]. If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. See Ibid. Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Moses H. Cone [Memorial Hospital v. Mercury Construction Corp.], 460 U.S. [1] at 24, [103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)].
[500 U.S. at 26, 111 S.Ct. at 1652, 114 L.Ed.2d at 37.]
Even before Gilmer the Supreme Court had decided a number of cases under the FAA involving commercial contracts containing broadly worded arbitration clauses, in which claims arising under a variety of federal statutes were held subject to arbitration. Mitsubishi Motors Corp. v. Soler Chrysler  Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (anti-trust claims arising under the Sherman Act, 15 U.S.C.A. § 1-7, held arbitrable); Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (claims of securities fraud arising under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. §§ 1961-1968 held arbitrable); Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (securities fraud claims arising under Section 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77l(2), held arbitrable).
The Gilmer majority affirmed the Fourth Circuit, holding that there was nothing in the text or legislative history of the ADEA which indicated an intent to preclude a waiver of a judicial forum for ADEA claims, nor could the majority find any inherent conflict between arbitration and the underlying purposes of the ADEA. The Court distinguished Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (in which an arbitration under a collective bargaining agreement was held not to bar subsequent litigation of a civil rights Act claim under 42 U.S.C.A. §§ 2000e-2000e-17, for racial discrimination in employment); Barrentine v. Arkansas-Best Freight System, 450 U.S. *397 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (in which an arbitration under a collective bargaining agreement was held not to bar subsequent litigation of a wage claim for alleged failure by the employer to pay plaintiff the minimum wage required under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 202(a), 206 and 216(b)); and McDonald v. City of West Branch, Mich., 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (in which no res judicata or collateral estoppel effect could be given to an arbitrator's denial of a discriminatory discharge claim in a subsequent action by a union employee under 42 U.S.C.A. § 1983 for alleged retaliatory discharge for exercising free speech and assembly rights and the right to petition government).
The Gilmer majority made the following distinctions between Gardner-Denver and its progeny and the case before it:
There are several important distinctions between the Gardner-Denver line of cases and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements." Mitsubishi, 473 U.S. [614] at 625, 87 L.Ed.2d 444, 105 S.Ct. 3346 [at 3353]. Therefore, those cases provide no basis for refusing to enforce Gilmer's agreement to arbitrate his ADEA claim.
[500 U.S. at 35, 111 S.Ct. at 1657, 114 L.Ed.2d at 43.]
Thus, it is clear that Lepore must be confined to claims for arbitration of CEPA claims arising under collective bargaining agreements and does not extend to similar claims arising under private employment agreements. Moreover, to the extent that the court in Labib failed to recognize the distinction between collective bargaining agreements and private employment contracts, its reasoning, in the light of Gilmer, now appears flawed.
*398 In any event Labib was decided under state law, rather than the FAA; and the public policy grounds for declining to compel arbitration of CEPA claims under state law, no matter how compelling, cannot dictate a similar result in cases arising under the FAA. That is so because the FAA has been held under the Supremacy Clause to preempt any state law or policy which would restrict arbitrability. Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1, 15-16 (1984); Perry v. Thomas, 482 U.S. 483, 490-491, 107 S.Ct. 2520, 2526, 96 L.Ed.2d 426, 436 (1987).
N.J.S.A. 34:19-5 details the remedies available in a civil action commenced by an aggrieved employee or former employee for acts by the employer in violation of CEPA, N.J.S.A. 34:19-3.[3]N.J.S.A. 34:19-5 provides:
Upon a violation of any of the provisions of this an act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction. Upon the application of any party, a jury trial shall be directed to try the validity of any claim under this act specified in the suit. All remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any legal or equitable relief provided by this act or any other statute. The court may also order:
a. An injunction to restrain continued violation of this act:
b. The reinstatement of the employee to the same position held before the retaliatory action, or to an equivalent position;
c. The reinstatement of full fringe benefits and seniority rights;
d. The compensation for lost wages, benefits and other remuneration;

*399 e. The payment by the employer of reasonable costs, and attorney's fees;
f. Punitive damages; or
g. An assessment of a civil fine of not more than $1,000.00 for the first violation of the act and not more than $5,000.00 for each subsequent violation, which shall be paid to the State Treasurer for deposit in the General Fund.
Although his complaint does not seek an injunction to restrain defendants from in submitting false or misleading financial reports to the NJDOI in the future, nor the imposition of a civil fine on defendants, plaintiff does request each of the other items of relief available under N.J.S.A. 34:19-5.
Plaintiff's argument that the CEPA provisions authorizing jury trials, injunctive relief, punitive damages and civil fines, evidence an intent by the New Jersey Legislature to require judicial resolution of CEPA claims and to preclude their arbitration must likewise be rejected under Southland Corp. and Perry on Federal preemption grounds. As the Gilmer majority observed by way of analogy, "[t]he Sherman Act, the Security Exchange Act of 1934, RICO and the Securities Act of 1933 are all designed to advance important pubic policies, but ... claims under those statutes are appropriate for arbitration.", 500 U.S. at 28, 111 S.Ct. at 1653, 114 L.Ed.2d at 38.
As stated in Mitsubishi Motors and reiterated in Gilmer, a party who agrees to arbitrate a statutory claim "... does not forego the substantive rights afforded by the statute; it only submits their resolution in an arbitral, rather than judicial forum." Mitsubishi Motors Corp., 473 U.S. at 628, 105 S.Ct. at 3354, 87 L.Ed.2d at 456; Gilmer, 500 U.S. at 26, 114 L.Ed.2d at 37, 111 S.Ct. at 1652. Among the powers vested in the arbitrator is the power to grant injunctive relief. Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 199 (4th Cir.1990), aff'd 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), where the court rejected plaintiff's argument that arbitrators lack the power to issue injunctive relief, holding that: "Arbitrators enjoy broad equitable powers. *400 They may grant whatever remedy is necessary to right the wrong within their jurisdiction." Accordingly, all the remedies available from a court under N.J.S.A. 34:19-5 are also available from the arbitrator.
Plaintiff also urges, in support of his argument as to the non-arbitrability of the CEPA claim, that unlike NYSE arbitration rules under consideration in Gilmer, the American Arbitration Association ("AAA") rules which govern any arbitration of the CEPA claim in this case do not provide for any pre-hearing discovery, and the absence of any provisions for such discovery would significantly prejudice his ability to present proofs to the arbitrators of the alleged CEPA violation committed by defendant.
In Gilmer, the Court, in rejecting plaintiff's argument against compelling arbitration of his ADEA claim that discovery allowed in the federal courts was broader than permitted under NYSE arbitration rules, thereby making it more difficult for him to prove age discrimination, reasoned as follows:
Gilmer also complains that the discovery allowed in arbitration is more limited that in the federal courts, which he contends will make it difficult to prove discrimination. It is unlikely, however, that age discrimination claims require more extensive discovery than other claims that we have found to be arbitrable, such as RICO and antitrust claims. Moreover, there has been no showing in this case that the NYSE discovery provisions, which allow for document production, information requests, depositions, and subpoenas, see 2 NYSE Guide ¶ 2619, pp 4318-4320 (Rule 619); Securities and Exchange Commission Order Approving Proposed Rule Changes By New York Stock Exchange, Inc., Nat. Assn. of Security Dealers, Inc., and the American Stock Exchange, Inc., Relating to the Arbitration Process and the Use of Predispute Arbitration Clauses, 54 Fed Reg 21144, XXXXX-XXXXX (1989), will prove insufficient to allow ADEA claimants such as Gilmer a fair opportunity to present their claims. Although those procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." Mitsubishi, supra, [473 U.S. 614] at 628, 87 L.Ed.2d 444, 105 S.Ct. 3346 [at 3354]. Indeed, an important counterweight to the reduced discovery in NYSE arbitration is that arbitrators are not bound by the rules of evidence. See 2 NYSE guide ¶ 2620, p 4320 (Rule 620).
[500 U.S. at 31, 111 S.Ct. at 1654-1655, 114 L.Ed.2d at 40.]
*401 Both parties agree that the Employment Dispute Resolution Rules (the EDR rules) of the AAA would govern any arbitration of the CEPA claim even though the employment agreement itself does not specify which of the various sets of rules of the AAA are to govern the arbitration.[4]
The EDR rules (paras. 6 and 19) contemplate that, in the discretion of the arbitrator, document discovery and discovery of other information may be had before the hearing and attendance of witnesses at the hearing may be compelled by subpoena. The EDR rules (para. 20) also allow the use of affidavits in lieu of testimony and the post hearing filing of such documents as the parties may agree upon or the arbitrator may direct. However, the EDR rules clearly do not provide for document or information discovery as a matter of right, nor is any provision made for interrogatory or deposition discovery.
While the scope of prehearing discovery under the NYSE arbitration rules considered in Gilmer was broader than that permitted under the EDR rules of the AAA, particularly in allowing deposition discovery, the Gilmer opinion makes clear that such differences in discovery cannot serve to preclude arbitration of statutory claims. Indeed, if the rule were otherwise and the right to arbitrate statutory claims was dependent on the extent of prehearing discovery allowed under the controlling arbitration rules, arbitration of a statutory claim could rarely be compelled.
For the foregoing reasons, Gilmer clearly mandates that statutory claims, such as the CEPA claim here involved, are subject to arbitration under an arbitration clause in a private employment agreement subject to the FAA, providing, of course, that the agreement contemplates arbitration of such statutory claims.

*402 C. Whether the Employment Agreement Compels Arbitration of the CEPA Claim

The arbitration clause in the plaintiff's contract provides that: "Any disputes between you and FFIC regarding this agreement will be resolved by arbitration according to the rules of American Arbitration Association then in effect."
The FAA announces a federal policy favoring enforcement of arbitration agreements. Moses H. Cone Hospital v. Mercury Constr., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765, 785 (1983). The FAA "... establishes that, as a matter of federal law any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." Id. at 24-25, 103 S.Ct. at 941, 74 L.Ed.2d at 785.
"[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Mitsubishi Motors Corp., 473 U.S. at 626, 105 S.Ct. at 3354, 87 L.Ed.2d at 455. Moreover, there is "... no warrant in the Arbitration Act for implying in every contract within its ken a presumption against arbitration of statutory claims." Id. at 625, 105 S.Ct. at 3353, 87 L.Ed.2d at 454.
The FAA policy favoring enforcement of arbitration agreements is so strong that claims of fraud in the inducement of the entire agreement, as distinguished from a claim of fraud in the inducement of the arbitration clause itself, must, under a broadly worded arbitration clause, be submitted to the arbitrator for resolution unless expressly excluded by the arbitration provision. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); S.A. Mineracao Da Trindade-Samitri v. Utah Intern., 745 F.2d 190 (2nd Cir.1984).
Plaintiff argues that the arbitration clause contained in his contract with Parkway is much narrower in scope than was the arbitration clause in Gilmer and should be read as not encompassing *403 statutory claims such as the one he seeks to enforce in this court under CEPA. Plaintiff further asserts that parties' intent not to submit such statutory claims to arbitration is evidenced by one of the contract's "miscellaneous" provisions requiring that "[t]his employment agreement and all matters or issues collateral hereto shall be governed by the laws of the State of California." Plaintiff contends that the latter provision clearly demonstrates that the parties did not contemplate submitting a CEPA claim to arbitration since any such claim clearly could not be governed by the laws of the State of California. Defendants, on the other hand, argue that the latter provision is not part of the arbitration clause and is directed to matters of contract interpretation. Defendants contend that the arbitration clause itself is broadly worded in requiring arbitration of all disputes "regarding this agreement" and that any ambiguity or doubt as to its scope should, under the above-cited cases, be resolved in favor of arbitrability of the CEPA claim.
Turning first to the scope of the arbitration provision itself, that clause, in requiring arbitration of "[a]ny dispute ... regarding this agreement," is very broadly worded. Webster's Third New International Dictionary (Unabridged 1969), at p. 1911, defines the word "regarding" as meaning "with respect to: concerning." The word "concerning" is defined as "relating to: regarding, respecting, about." Id. at 470.
Plaintiff's CEPA claim concerns his assertion that his employment with Parkway was wrongfully terminated because of his refusal to participate in a scheme to submit fraudulent financial data to the NJDOI. Plaintiff's contract, as noted above, contains extensive provisions dealing with termination of his employment with Parkway for cause, for disability and without cause. Plaintiff's effort to distinguish Gilmer based on the allegedly broader provisions in the arbitration provision involved in that case lacks merit.
In Gilmer the arbitration clause required arbitration of "[a]ny controversy ... arising out of the employment or termination of *404 employment" of any registered securities representative. 500 U.S. at 23, 111 S.Ct. at 1651, 114 L.Ed.2d at 35. Although the employment agreement here involved does not expressly provide for arbitration of any dispute "arising out of employment or termination of employment," the provision requiring arbitration of "[a]ny dispute ... regarding this agreement," must be construed broadly with all doubts and ambiguities resolved in favor of arbitrability. So construed, that arbitration provision must be interpreted as requiring arbitration of plaintiff's CEPA claim against Parkway, since that claim concerns termination of his employment with that company, a subject specifically provided for in the contract.
This construction is supported by a number of lower federal court cases decided since Gilmer, which have construed arbitration clauses in employment agreements as requiring arbitration of a variety of discrimination claims asserted under various federal and state statutes. Williams v. Katten, Muchin & Zavis, 837 F. Supp. 1430 (N.D.Ill. 1993): Scott v. Farm Family Life Ins. Co, 827 F. Supp. 76 (D.Mass. 1993); Hull v. NCR Corp., 826 F. Supp. 303 (E.D.Mo. 1993).
In Williams, claims of racial, sex and religious discrimination against an African-American female partner in a law firm which were asserted under the Civil Rights Act of 1964, 42 U.S.C.A. § 1981, were declared arbitrable under the arbitration clause of the partnership agreement. That clause required arbitration of "[a]ny controversy or claim arising out of or relating to any provision of this Agreement or any other document or agreement referred to herein (including, but not limited to the Retirement Plan and the Disability Plan) ..." 837 F. Supp. at 1432, n. 2.
In Scott, plaintiff, an unmarried pregnant woman, brought a wrongful termination suit against her former employer, alleging discrimination based on her sex, marital status and pregnancy in violation of the Civil Rights Act of 1964 and certain Massachusetts state anti-discrimination statutes. Those statutory claims were held to be arbitrable under the terms of the Agent Contract *405 plaintiff had signed when hired by defendant as an insurance sales agent. That contract provided that "all disputes arising under this agreement ... shall be resolved by binding arbitration ..." 827 F. Supp. at 77.
In Hull, plaintiff brought suit against her employer alleging discrimination against her in violation of the Civil Rights Act of 1964, the ADEA and the Missouri Human Rights Act. These statutory claims were held to be subject to arbitration under the terms of plaintiff's employment agreement, which provided that "[a]ny controversy or claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration ..." 826 F. Supp. at 304.
Plaintiff also argues that the arbitration clause contemplates arbitration of contract claims, not tort claims, and that since the CEPA claim for retaliatory discharge is a tort claim which has been codified by the Legislature, arbitration of that claim should not be compelled. That argument must be rejected as well, because broadly worded arbitration provisions governed by the FAA, such as the one here involved, have been construed as encompassing tort, as well as contract claims. In In Re Oil Spill by the "Amoco Cadiz," etc., 659 F.2d 789, 794 (7th Cir.1981), the court rejected a similar argument that plaintiff's claims for negligence, fraud and breach of the warranty of seaworthiness were not encompassed by a broadly worded arbitration provision, holding:
Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause. Were the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims. See, e.g., Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd., 385 F.2d 158 (2d Cir.1967), in which the court held that tort claims arising out of or related to a breach of contract were arbitrable under an arbitration provision covering "any dispute or difference arising out of or relating to this contract," observing that the plaintiff could not "avoid the language of the arbitration clause by casting its complaint in tort."
[Id. at 159]
Numerous other cases may be found in which tort claims have been submitted to arbitration under broad form arbitration clauses *406 governed by the FAA. See e.g., Perry v. Thomas, supra, (conversion and civil conspiracy to commit conversion submitted to arbitration); Swenson v. Management Recruiters Intern., Inc., 858 F.2d 1304 (8th Cir.1988) (invasion of privacy and conversion of mail held arbitrable); Philippines v. Westinghouse Electric Corp., 714 F. Supp. 1362 (D.N.J. 1989) (negligence, common law fraud, civil conspiracy to commit fraud and claims under the New Jersey Consumer Fraud Act held arbitrable); McMahon v. RMS Electronics, Inc., 618 F. Supp. 189 (S.D.N.Y. 1985) (defamation claims held arbitrable).
Moreover, in Labib, the court, while holding that plaintiff's CEPA claim was not subject to arbitration under New Jersey law, found that the arbitration clause in plaintiff's employment agreement, which mandated arbitration of "[a]ny controversies or disagreements arising out of, or related to this Agreement or the breach thereof ...," was very broad and that plaintiff's CEPA claim "related to" the employment contract. 755 F. Supp. at 128.
The issue then is whether the provision in plaintiff's contract with Parkway, which requires the laws of California to govern the contract "... and all matters and issues collateral hereto..." should be construed as evidencing an intent by the parties to exclude the CEPA claim from the otherwise broad provisions of the arbitration clause. Neither of the parties has cited and the court has not found any case which specifically considers the effect of a choice of law provision on the scope of an arbitration provision and the arbitrability of claims arising under a statute of the federal government or of a state other than the state whose law has been selected to govern disputes related to the contract.[5]
*407 The effect of the choice of law provision on the scope of the arbitration provision involved in this case may be resolved by reference to that line of cases arising under the FAA which have held that contract clauses purporting to exclude certain disputes from arbitration must be clear and unambiguous in their intent to preclude arbitration of such disputes. S.A. Mineracao Da Trindade-Samitri v. Utah Intern., supra, 745 F.2d at 194-195, which held:
The federal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible.
[D]oubts as to arbitrability should be `resolved in favor of coverage,' ... language excluding certain disputes from arbitration must be `clear and unambiguous' or `unmistakably clear' and ... arbitration should be ordered `unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' Wire Service Guild v. United Press International, 623 F.2d 257, 260 (2d Cir. 1980) (quoting International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. General Electric Co., 406 F.2d 1046, 1048 (2d Cir.1969)).
It can hardly be argued that the choice of law provision makes "unmistakably clear" the intent of the parties to exclude from arbitration statutory claims other than those arising under California law. Accordingly, the choice of law provision must be construed as applying only to issues of contract construction and claims regarding voidability or unenforceability of any contract *408 provision or of the entire contract.[6] However, the clause cannot sensibly be construed as bearing upon or as barring arbitration of such statutory claims.
For the foregoing reasons, the court concludes that plaintiff's CEPA claim against Parkway must be submitted to arbitration.

D. Whether FFIC and Barrette Can Require Arbitration of the CEPA Claims Against Them.

Defendants FFIC and Barrette also seek to compel plaintiff to submit his CEPA claims against them to arbitration. Plaintiff resists that application on the grounds that FFIC had assigned the employment agreement to Parkway before any of plaintiff's CEPA claims arose and that Barrette is not a party to the contract of employment and cannot assert any rights under that agreement.
It is axiomatic that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Technologies, Inc. v. Communication Workers of America, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648, 655 (1986); United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409, 1417 (1960); PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3rd Cir.1990); Morristown Daily Record v. Graphic Com., Local 8N, 832 F.2d 31, 33 (3rd Cir.1987). A corollary to that principle is that "a person cannot be compelled to arbitrate a dispute with another person unless there is mutual agreement to do so." Wasserstein v. Kovatch, 261 N.J. Super. 277, 284, 618 A.2d 886 (App.Div. 1993).
*409 Defendants rely upon Pritzker v. Merrill Lynch, Pierce Fenner & Smith, 7 F.3d 1110 (3d Cir.1993) and Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2nd Cir.1993), cert. den. ___ U.S ___, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993) in support of their argument that the CEPA claims against FFIC and Barrette are subject to arbitration.
In Pritzker, trustees of a pension fund brought a claim against a brokerage firm, an individual broker and a company affiliated with the brokerage firm for breach of their fiduciary duties under the Employment Income Security Act of 1974, 29 U.S.C.A. §§ 1001-1461 ("ERISA"), for purchasing several units of a limited partnership interest in ML Lee Acquisition Fund II, L.P. (ML Lee) on behalf of the pension fund without authorization. The trustees had opened two Cash Management Accounts for Retirement Plans with the defendant, Merrill Lynch, Pierce, Fenner & Smith (MLPF & S). Each Cash Management Agreement contained a clause requiring arbitration of all controversies between the trustees and MLPF & S. The individual broker, Belinda P. Stewart (Stewart), who was responsible for the unauthorized purchase of the ML Lee units, and defendant, Merrill Lynch Asset Management, Inc. (MLAM), a wholly owned subsidiary of Merrill Lynch & Co., Inc., which, as custodian of the Cash Management Accounts, credited the purchase transaction to the accounts, were not signatories of the Cash Management Agreements. The trustee alleged that the ML Lee purchases were inappropriate investments for the pension fund because they were illiquid, lacked a secondary market, involved a high degree of risk and were contrary to the pension plan's stated investment objectives.
After concluding that the ERISA claims were subject to arbitration under the Cash Management Agreement, the Pritzker court rejected the trustees' argument that the ERISA claim should not proceed to arbitration against either Stewart or MLAM because neither had signed the arbitration agreement. As to the individual broker, the court held:

*410 As to Stewart, the decision is quite straight forward. Under traditional agency theory, she is subject to contractual provisions to which MLPF & S is bound. Barrowclough [v. Kidder, Peabody & Co., Inc.], 752 F.2d [923] at 938. [(3rd Cir.1985)] Because a principal is bound under the terms of a valid arbitration clause, its agents, employees and representatives are also covered under the terms of such agreements. See, Arnold v. Arnold Corp., 920 F.2d 1269, 1281-82 (6th Cir.1990); Letizia v. Prudential Bache Securities, 802 F.2d 1185, 1187-88 (9th Cir.1986).
[7 F.3d at 1121.]
In compelling arbitration of the trustees' ERISA claim against MLAM, the Pritzker court reasoned:
For analogous reasons, we find that the claims against MLAM, the corporate sister of MLPF & S, likewise fall within the scope of the arbitration agreements. Agency logic has been applied to bind non-signatory business entities to arbitration agreements. Isidor Paiewonsky Associates, Inc. v. Sharp Properties, Inc., 998 F.2d 145 (3d Cir. 1993); Nesslage v. York Securities, Inc., 823 F.2d 231, 233 (8th Cir.1987); see also Ketchum v. Almahurst Bloodstock IV, 685 F. Supp. 786, 793-94 (D.Kan. 1988). While it is not exactly clear what role MLAM played in the alleged statutory violations, it is evident from the record that MLAM was obligated to perform certain services in connection with the Accounts opened by the Trustees. Moreover, MLAM, like MLPF & S, is a subsidiary of Merrill Lynch & Co., Inc., and may be an alter-ego of MLPF & S.
[7 F.3d at 1122.]
A similar rationale was employed in Roby. In rejecting plaintiff's argument that they were entitled to litigate in federal court their statutory securities claims against the Chairs, who were not signatories to the arbitration argument, the Roby court held:
The Roby Names argue that ... the complaints against the individual Chairs are distinct from those against their employers. They contend that the Chairs have not been sued for acts carried out on behalf of the Members' and Managing Agents (Agents) or in violation of the Agents' contractual obligations to the Roby Names. Instead, they have been sued as "controlling persons" under the securities laws.
We believe that this a distinction without a legal difference. The complaints against the individual Chairs are completely dependent on the complaints against the Agents. Whether the individual Chairs are disclosed agents or controlling persons, their liability arises out of the same misconduct charged against the Agents. If the scope of the Agents' agreements includes the Agents' misconduct, it necessarily includes the Chairs' derivative misconduct. Moreover, we believe that the parties fully intended to protect the individual Chairs to the extent they are charged with misconduct within the scope of the agreements. If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves.
[996 F.2d at 1360.]
*411 Other courts have also applied contract and agency principles to require that claims against officers or employees of one of the contracting parties and independent companies who were not signatories to the arbitration contract be submitted to arbitration. See e.g., Arnold v. The Arnold Corporation, 920 F.2d 1269, 1281-1282 (6th Cir.1990) (plaintiff's federal securities law and RICO claim against non-signatory officers of defendant and an independent broker dealer held arbitrable); Letizia v. Prudential Bache Securities, Inc., 802 F.2d 1185, 1187-88 (9th Cir.1986) (broker's employees entitled to invoke arbitration clause in their employer's brokerage agreement to require arbitration of fraud and federal securities law violations); Barrowclough v. Kidder Peabody & Co., 752 F.2d 923, 938 (3rd Cir.1985)[7] (employee and his non-signatory contingent beneficiaries compelled to arbitrate with employer and non-signatory administrators of deferred compensation plan a dispute concerning their entitlement to accrued benefits under plan); but cf., McCarthy v. Azure, 22 F.3d 351 (1st Cir.1994) (officer of purchasing corporation not entitled to arbitrate seller's fraud, intentional infliction of emotional distress, securities law violations and RICO claims). Similarly, where a claimant has entered into an arbitration agreement with defendant, another company, whose claim is dependent upon an agency relationship with the initial party claimant to the arbitration contract, may be required to submit its claim against the defendant to arbitration even though that other company never entered into the arbitration contract. In Re Oil Spill by the "Amoco Cadiz," supra, 659 F.2d at 795-796.
The policy argument favoring the submission of the claims of non-signatory parties to arbitration when justified by agency or contract principles was stated in Arnold as follows:
We agree with the district court that if appellant "can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as *412 [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified." Arnold v. Arnold Corp., 668 F. Supp. 625, 629 (N.D.Ohio 1987). See also Hilti, Inc. v. Oldach, 392 F.2d 368, 369 n. 2 (1st Cir.1968).
* * * * * * * *
Other circuits have held consistently that nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles. (citations omitted) ... The rule is an outgrowth of the strong federal policy favoring arbitration. See generally Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 [625-27], 105 S.Ct. 3346, 3353-54, 87 L.Ed.2d 444 (1985).
[920 F.2d at 1281.]
Any claim plaintiff has against FFIC and Barrette under CEPA rests upon proof that they come within the very broad statutory definition of the term "employer" as meaning, in pertinent part, "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent ..." N.J.S.A. 34:19-2a. Thus, in order for plaintiff to secure compensatory and punitive damages, attorneys' fees and the other relief he seeks in his complaint from these defendants under N.J.S.A. 34:19-5, he must demonstrate they acted in a representative capacity for Parkway.
Moreover, there is no question but that Barrette was board chairman of Parkway at the time that the predicate acts giving rise to CEPA claim occurred; that FFIC was Parkway's parent company; that FFIC controlled Parkway's actions both with respect to the submission of allegedly false financial statements to the NJDOI and with respect to the allegedly retaliatory discharge of plaintiff; and that the acts of FFIC were with the consent of Parkway. Thus, submission of plaintiff's CEPA claim against those defendants on the agency basis recognized in Pritzker, Roby, Arnold, Letzia and Barrowclough is well founded.
In addition there is a contract basis for requiring submission of plaintiff's CEPA claim against FFIC to arbitration. FFIC was a signatory to the contract with plaintiff and after assigning that contract to Parkway, FFIC agreed, pursuant to section 13 of the *413 contract, "... to remain obligated under it." This provision rendered FFIC a surety, obligating it to guarantee performance of Parkway's financial obligations to plaintiff under the contract. Such broad assumption of liability by FFIC would include an obligation to guarantee payment by Parkway of any damages awarded to plaintiff by the arbitrator if Parkway is found to have terminated plaintiff's employment in violation of CEPA.
For the foregoing reasons, defendants' motion to compel arbitration of plaintiff's CEPA claims against all three defendants and to stay this action will be granted.
NOTES
[1] N.J.S.A. 17:33B-1 to 17:33B-63.
[2] Plaintiff did not assert that the exception contained in section 1 of the FAA for employment contracts of "any other class of workers engaged in foreign or interstate commerce" applies to him and, accordingly, this court does not have to resolve that issue. The question has not been decided by the Supreme Court, which expressly refused to address the issue of whether all individual contracts of employment are excluded from the FAA by the section 1 exclusion. Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, n. 2, 111 S.Ct. 1647, 1651, n. 2, 114 L.Ed.2d 26, 36-37, n. 2 (1991). The majority of lower federal courts which have considered the issue have held that section 1 of the FAA does not exclude all contracts of employment, and that in following the specific exemptions for seamen and railway workers, Congress intended to exempt only those class of workers "actually engaged in the movement of interstate or foreign commerce." Tenney Engineering, Inc. v. United Electric Radio & Machine Workers, 207 F.2d 450, 452 (3rd Cir.1953). Accord, Miller Brewing Co. v. Brewery Workers Local Union No. 9, 739 F.2d 1159, 1162 (7th Cir.1984), cert. den. 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985); Erving v. Virginia Squires Basketball Club, 468 F.2d 1064, 1069 (2nd Cir.1972); Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir.1971); Pietro Scalzitti v. International Union of Operating Engineers, 351 F.2d 576, 579-80 (7th Cir.1965); Williams v. Katten, Muchin & Zavis, 837 F. Supp. 1430, 1438-39 (N.D.Ill. 1993); Scott v. Farm Family Life Insurance Co., 827 F. Supp. 76, 78-79 (D.Mass. 1993); Hull v. NCR Corporation, 826 F. Supp. 303, 306-307 (E.D.Mo. 1993). Authority for the opposing view that all employment agreements are excluded by section 1 from the provisions of the FAA, which view is based upon the legislative history of the statute, may be found in Justice Stevens dissent in Gilmer, 500 U.S. at 36, 111 S.Ct. at 1657, 114 L.Ed.2d at 45-46. At least one federal appeals court has agreed with the view expressed by Justice Stevens. Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 311-312 (6th Cir.1991) (which held individual employment contracts to be outside the scope of the FAA).
[3] N.J.S.A. 34:19-3 prohibits discharge from employment or other retaliatory action by an employer against an employee (1) for disclosing or threatening "to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is violation of law, or a rule or regulation promulgated pursuant to law;" (b) for providing information to or testifying "before any public body conducting an investigation, hearing or inquiry into any" such violation by the employer of any law, rule or regulation; and (c) for objecting to or refusing "to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law; (2) is fraudulent or criminal; or (3) is incompatible with the clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." Ibid.
[4] In the absence of any provision in the contract, paragraph 9 of the EDR rules provides for the appointment of a single arbitrator to hear and resolve the dispute unless the AAA in its discretion directs that a greater number of arbitrators be appointed. In this case the employment agreement is silent on the number of arbitrators to be appointed.
[5] Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7 F.3d 1110 (3d Cir.1993), cited by defendants on another issue, contained a choice of law provision within the arbitration clause, but the court, in compelling arbitration of an ERISA claim brought by the trustees of a pension fund against a brokerage firm, did not consider or discuss the effect, if any, of that provision, on the scope of the arbitration clause. In Arnold v. The Arnold Corporation, 920 F.2d 1269, 1271-1272 (6th Cir.1990), the arbitration clause also contained a choice of law provision requiring Ohio law to govern any dispute "arising under the Agreement", and the court compelled arbitration of claims under Section 10(b) of the Securities Exchange Act of 1934 and RICO, but did not consider or discuss the effect of the choice of law provision on the scope of the arbitration provision. The court, in Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2nd Cir.1993), cert. den. ___ U.S. ___, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993), also cited by defendant on another issue, held that the choice of law and forum selection clause in the arbitration provision of an international commercial insurance agreement, which required arbitration of disputes in England under English law, could not be used to avoid arbitration of securities fraud claims through the assertion of such claims under the Securities Act of 1933, the Securities Exchange Act of 1934 and RICO. However, the Roby decision was influenced by considerations of international commerce and comity not here present and, accordingly, provides no guidance for resolution of the issue raised here.
[6] While plaintiff has not raised in this proceeding any issues of contract construction other than as to the scope of the arbitration provision nor has he asserted any claims as to voidability or unenforceability of any contract provision or of the entire agreement, if any such issues or claims are subsequently raised, they must be resolved by the arbitrator. Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra.
[7] Barrowclough, was overruled in part by Pritzker, supra, 7 F.3d at 1111, to the extent only that Barrowclough held ERISA claims not arbitrable, but the Pritzker court otherwise confirmed Barrowclough as still good law.