1 A.3d 806 (2010)
415 N.J. Super. 272
The ESTATE OF Anna RUSZALA by Marie MIZERAK (Executrix), Plaintiff-Respondent,
v.
BROOKDALE LIVING COMMUNITIES, INC., d/b/a Alterra/Sterling House of Florence, Alterra, Inc., d/b/a Sterling House of Florence, Sterling House of Florence, Kad Randal, Valeyncia Price, Annie Lewis, and Sharon Luflin, Defendants-Appellants.
Ida Azzaro, as Proposed Administrator Ad Prosequendum and Administrator for the Estate of Pasquale Azzaro, Plaintiff-Respondent,
v.
Brookdale Living Communities, Inc., d/b/a Alterra Healthcare Corporation, Defendant-Appellant.
Docket No. A-4403-08T1,
Docket No. A-4404-08T1.
Superior Court of New Jersey, Appellate Division.
Argued (A-4403-08T1) February 9, 2010.
Submitted (A-4404-08T1) February 9, 2010.
Decided August 10, 2010.
*808 Joel I. Fishbein argued the cause for appellants (Spector, Gadon & Rosen, P.C., attorneys; Mr. Fishbein, on the brief).
Law Office of Thomas P. Frascella, L.L.C., attorneys for respondent the Estate of Anna Ruszala (Thomas P. Frascella, Princeton, on the brief).
Andrew J. D'Arcy, Galloway, argued the cause for respondent Ida Azzaro (D'Arcy Johnson Day, P.C., attorneys; Mr. D'Arcy, on the brief).
Before Judges SKILLMAN, FUENTES, and GILROY.
The opinion of the court was delivered by
FUENTES, J.A.D.
These back-to-back appeals, consolidated for the purpose of this opinion, require us to determine the enforceability of arbitration provisions in nursing home contracts. Specifically, we must decide whether § 2 of the Federal Arbitration Act (FAA), 9 U.S.C.A. § 2, which declares arbitration provisions in contracts "valid, irrevocable, and enforceable," preempts the public policy of this State as expressed by the Legislature in N.J.S.A. 30:13-8.1, one of the key components of the "Nursing Home Responsibilities and Rights of Residents" act (the Act). N.J.S.A. 30:13-8.1 renders void and unenforceable "[a]ny provision or clause waiving or limiting the right to sue . . . between a patient and a nursing home."
Although not dispositive of this controversy, this question pits our State's laws protecting the elderly and infirm against a national policy favoring arbitration as an alternative forum for resolving civil disputes. Ultimately, we diffuse this tension by both respecting the supremacy of federal law while relying on well-established principles of contract law to declare certain provisions of the arbitration agreements unenforceable under the doctrine of substantive unconscionability.
These abstract considerations are played out in the real life tribulations of two *809 elderly residents as they struggled to arrange for the care necessary to end their lives with compassion and dignity. The two plaintiffs, Ida Azzaro and Marie Mizerak, each signed residency agreements with two New Jersey assisted living facilities operated by Alterra Healthcare Corporation (Alterra), which is owned by Brookdale Living Communities, Inc. (Brookdale), both out-of-state companies. Ms. Azzaro signed the agreement on behalf of her husband, Pasquale Azzaro; Mizerak signed for Anna Ruszala, for whom she had power of attorney. Each resident suffered significant injuries at their facility and later died as a result. Plaintiffs brought suits sounding in negligence and wrongful death against Alterra, Brookdale, and other individuals associated with the ownership and operation of these facilities.
Both of the contracts signed by plaintiffs contain identical arbitration and limitation of liability provisions. The arbitration provisions require that all claims, except eviction proceedings, be resolved through binding arbitration. Other sections of the arbitration and limitation of liability clauses significantly restrict discovery, limit compensatory damages, and prohibit punitive damages.
These cases came before the trial court on defendants' motions to compel binding arbitration. The trial court initially denied defendants' motion without prejudice and directed the parties to conduct limited discovery on the issue of the enforceability of the arbitration provisions.
Defendants renewed their motions to compel arbitration at the end of this limited discovery period. The court denied defendants' motions without an evidentiary hearing, finding three legally independent grounds for not enforcing the arbitration provisions: (1) the arbitration provisions were void as against public policy under N.J.S.A. 30:13-8.1; (2) the FAA is not applicable because the transactions between the parties did not involve interstate commerce; and (3) even if N.J.S.A. 30:13-8.1 is preempted by the FAA, the arbitration agreements are part of a consumer contract of adhesion and the particular limitations and prohibitions contained therein are unenforceable under the common law defense of unconscionability.
By leave granted, defendants now appeal arguing that the trial court erred when it found that the FAA does not preempt the anti-arbitration provision in N.J.S.A. 30:13-8.1, that there is insufficient evidence to support the trial court's conclusion that these residency agreements are contracts of adhesion, and that the provisions restricting discovery, setting caps on compensatory damages, and precluding punitive damages are not unconscionable. Alternatively, defendants contend that if the clauses are unconscionable, the remedy should be the severance of the particular provisions, not invalidation of the entire arbitration agreement.
We now consolidate these two appeals because they share a common core of legal issues. After reviewing the record developed before the trial court, we reverse the court's finding that the FAA is inapplicable to the arbitration agreements at issue. We are satisfied that the FAA preempts the anti-arbitration provision in N.J.S.A. 30:13-8.1. The economic activities performed by these nursing facilities in servicing the residency contracts "involve" interstate commerce. We affirm, however, the trial court's determination that some of the arbitration provisions in the residency agreements signed by plaintiffs are unenforceable based on the doctrine of substantive unconscionability. These residency agreements were contracts of adhesion as they were presented on a "take-it-or-leave-it" basis, evidencing indicia of procedural *810 unconscionability as discussed by the court in Muhammad v. County Bank of Rehoboth Beach, 189 N.J. 1, 15, 912 A.2d 88 (2006), cert. denied, 549 U.S. 1338, 127 S.Ct. 2032, 167 L.Ed.2d 763 (2007). However, the limited record before us is insufficient to demonstrate a level of procedural unconscionability that would invalidate the parties' arbitration agreement. This paucity of evidence, however, does not affect our ability to review these provisions under the doctrine of substantive unconscionability, id. at 16, 912 A.2d 88, using the factors identified by the Court in Rudbart v. North Jersey District Water Supply Commission, 127 N.J. 344, 356, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). Applying these principles to the arbitration provisions in question, we are satisfied that the discovery restrictions, limitations on compensation for non-economic damages, and the outright preclusion of punitive damages are substantively unconscionable. Therefore, we strike these offending provisions and remand the Ruszala matter to arbitration. Finally, we remand the Azzaro matter to the trial court to determine whether a valid contract was formed between the parties.
The following facts will inform our discussion of these legal issues.

I
Sterling House of Florence (Sterling House) and Clare Bridge of Westampton (Clare Bridge) are assisted living facilities managed by Alterra, a Delaware corporation with its principal place of business in Milwaukee, Wisconsin. Brookdale owns Alterra and is also a Delaware corporation. Brookdale's principal place of business is in Chicago, Illinois.
Sterling House and Clare Bridge purchase supplies, such as food, medicine, and medical equipment, "primarily from out-of-state vendors" through "mail, electronic mail, telephone[,] and facsimile transmissions."[1] These facilities' vendors include: "the Sysco Corporation of Texas; Medline of Illinois; and Direct Supply of Wisconsin." Both facilities "accept out-of-state residents," and Alterra "accepts Medicaid waiver payments on behalf [of] residents" of both Sterling House and Clare Bridge. Ten percent of Sterling House residents and eleven percent of Clare Bridge residents are eligible for Medicaid.[2]

Anna Ruszala
On or about January 21, 2002, eighty-five-year-old Anna Ruszala became a resident at Sterling House. From the start of her residency and continuing for approximately two and one-half years, there was no evidence that she, or anyone acting on her behalf, executed a formal residency agreement with Sterling House.
Sometime before April 2004, Ruszala executed a power of attorney designating Marie Mizerak[3] as her attorney in fact. Mizerak entered into a residency agreement on Ruszala's behalf on April 28, 2004, with an effective date of April 1, 2004. According to an affidavit executed by Alterra's Vice President for Legal, Ruszala received a "loyalty discount" in part for agreeing to the arbitration and limited liability *811 provisions in the 2004 residency agreement.[4]
Ruszala resided at Sterling House until July 11, 2006, when she was taken to Virtua Hospital in Marlton, New Jersey. By 2006, Ruszala was no longer ambulatory and "slept in a `special bed' [that] was lowered to protect her from potential injury[-inducing] falls."
The details of the incident that led to her hospitalization are not clear. The initial reports indicate that Ruszala fell from a two-foot high bed. The hospital records, however, reflect possible geriatric abuse. Ruszala died ten days after her admission to Virtua Hospital; she was ninety-three years old.

Pasquale Azzaro
On December 8, 2005, Ida Azzaro entered into a residency agreement with Alterra to admit her husband Pasquale Azzaro to the Clare Bridge assisted living facility. Mr. Azzaro resided at Clare Bridge from December 9, 2005, until January 1, 2006; he died three days later on January 4, 2006.
In an affidavit submitted to the trial court in opposition to defendants' motion to compel arbitration, Ms. Azzaro indicated that she and her husband first met with a representative of Alterra one week before her husband's admission into Clare Bridge. According to Ms. Azzaro, "the purpose of this visit was [for the Alterra representative] to explain the benefits of the facility and how it would be able to meet the needs of my husband." The meeting lasted approximately one hour.
According to Ms. Azzaro, Alterra's representative did not explain the legal implications of the residency agreement or suggest that she seek independent legal advice before signing it. Ms. Azzaro's affidavit contains the following allegations concerning Alterra's efforts to inform her and her husband about the limitations embodied in the arbitration provisions:
We were never advised that we should seek legal counsel to review the Agreement prior to signing it, nor were we in any way cautioned that the agreement included language that may limit my husband's legal rights or require that claims against the facility be pursued in an arbitration forum rather than a court of law. Certainly, had such a comment or reference been made, I would have asked follow-up questions and we would have sought the advice of our attorney. I would never have knowingly signed an agreement waiving legal rights of my husband nor[,] in my opinion[,] would he have signed such a document. At no point in time, either on that day or at any time while my husband was a resident at the facility, were we advised that it would be important to review this document and/or have its provisions evaluated by an attorney. Had we know that this facility required my husband to waive legal rights as part of admission, I am certain we would have found another facility for my husband to reside.
I do recall that the representative from the facility advised that, as a resident at the facility, my husband had legal rights under New Jersey's laws and that the facility made it a priority to see that those rights were not violated. We were pleased and encouraged to hear that fact. We relied upon that representation in our decision making process to choose this facility.

*812 It was my understanding that this document was a form document that was part of the admission process and that it could not be changed in any way.
. . . .
It was never explained to me or my husband at any time by any representative of the facility what an arbitration clause means or even what the word arbitration means. I do not recall the word "arbitration" being mentioned in any context whatsoever.
. . . .
Based on the facility representative's representations to me, I did not have any expectation or understand that any document that I was signing could in any way prevent me or my husband from asserting claims for abuse and/or neglect in a court of law if such a claim ever arose.
Although Ms. Azzaro signed the residency agreement as a "responsible party," she emphatically denied ever having had power of attorney over her husband's affairs, or at any time representing herself as having such authority. She claimed that she signed the residency agreement because the representative of Alterra told her that her signature was required "as an individual who agreed to be financially responsible for any bills associated with the admission."

II
The residency agreements executed by both Ms. Azzaro and Mizerak are identical and both include Section V: "Arbitration and Limitation of Liability Provision." This Section contains three subsections: Subsection A, entitled "Arbitration Provision"; Subsection B, entitled "Limitation of Liability Provision"; and Subsection C, entitled "Benefits of Arbitration and Limitation of Liability Provisions."
Subsection A(1) states that
[a]ny and all claims or controversies arising out of or in any way relating to this Agreement or the Resident's stay at Alterra, excluding any action for eviction, and including disputes regarding interpretation of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory[,] or punitive damages and whether sounding in breach of contract, tort[,] or breach of statutory duties, irrespective of the basis for the duty or the legal theories upon which the claim is asserted, shall be submitted to binding arbitration, as provided below, and shall not be filed in a court of law. The parties to this Agreement further understand that a jury will not decide their case. The New Jersey State Statutes concerning arbitration shall govern the procedure, except if inconsistent with this Arbitration Provision or expressly stated otherwise in this Agreement. Further, nothing in this Agreement is to be construed to contradict any applicable New Jersey statutory grievance or mediation procedure. Any party who demands arbitration must do so for all claims or controversies that are known, or reasonably should have been known, by the date of the demand for arbitration, and if learned of during the course of the arbitration proceeding shall amend the claims or controversies to reflect the same. All current damages and reasonably foreseeable damages arising out of such claims or controversies shall also be incorporated into the initial demand or amendment thereto.
The remaining provisions of Subsection A detail the manner by which arbitration between the parties would be initiated and *813 conducted. Subsection A(6) sets out perimeters for discovery, including a limitation on depositions to only those of experts. Subsection A(13) incorporates by reference the Limitation of Liability Provision found in Subsection B into the arbitration provision. Subsection A(14) states that the Arbitration and Limitation of Liability Provisions "shall survive the death of the Resident."
The Limitation of Liability Provision found at Subsection B states, in italics, "Read Carefully Before Signing." In several ways, this provision limits liability for any "claims by, or on behalf of, a Resident, Resident Party, or by a Resident's Estate, Agent or Legal Representative, arising out of the care or treatment received by the Resident or the Resident's occupancy or presence at Alterra, including, without limitation, claims for medical negligence[.]" This section provides that all "[n]et economic damages" awarded must be "offset by any collateral source payments such as payments made by medical insurance." It also: (1) limits noneconomic damages, such as pain and suffering, to "a maximum of $350,000.00"; (2) prohibits payment of "[i]nterest and/or late fees on unpaid assisted living charges"; and (3) precludes any award for punitive damages.
Subsection C details the "Benefits of Arbitration and Limitation of Liability Provisions." The section describes arbitration as providing "cost-effectiveness and time-savings." The language selected by the drafter further states that "[t]he parties' decision to select arbitration and to agree to a limitation of liability" results in "more affordable" services for the resident. The alleged time-savings derived from arbitration is portrayed as preferable for the "often . . . elderly [residents with] limited life-expectanc[ies]." This subsection ends with the following caveat:
The Resident, Responsible Party, or his or her legal guardian, or authorized Power of Attorney understands that other assisted living companies' Agreements may not contain an arbitration provision, or limitations of liability provision. The parties agree that the reasons stated above are proper consideration for the acceptance of the Arbitration and Limitation of Liability Provisions. The undersigned acknowledges that he or she has been encouraged to discuss this Agreement with an attorney.
The parties to this Agreement further understand that a jury will not decide this case.
Other than restating that "a jury will not decide this case," this section contains no corresponding details regarding the rights and benefits a party may be giving up by agreeing to these provisions.
After each subsection in Section V, a line is provided next to an "x" under which it states: "Please initial as having read and understood the provisions." The initials "M.K.M.P.O.A.," for Marie Mizerak, are contained on each such line of Ruszala's residency agreement. The initials "I.A.," for Ida Azzaro, are contained on each such line of Mr. Azzaro's agreement.
Section VI(A) contains an additional provision stating that "[i]f it is determined by a court of law that the Arbitration Provision provided in this Agreement is invalid, the parties hereto make clear their express desire to waive a jury trial and resolve their claims against each other in the appropriate court solely before a judge."
Finally, the residency agreement contains two severance provisions. The first is found within the limited liability provision of the arbitration clause. It provides that "[s]hould sub-sections a [offset of net economic damages by payments from collateral sources], b [economic damages cap of $350,000], c [no interest or late fees to *814 be awarded on unpaid assisted living charges], and/or d [prohibition of punitive damages], provided above, be deemed invalid, the validity of the remaining sub-sections will not be affected." The second severance provision is contained in Section VI(I) and states that "[s]hould any part of this Agreement be invalid, the validity of the other parts of this Agreement will not be affected."

III
On June 11, 2007, the Estate of Anna Ruszala filed suit against Alterra and a number of its employees in the Superior Court of Burlington County alleging that the negligent care decedent received while a resident at Sterling House was a proximate cause of the injuries she sustained and that these injuries contributed to her death. The Estate sought compensatory damages, including an award for the pain and suffering decedent endured before her death, wrongful death damages, punitive damages, and counsel fees and costs.
Plaintiff immediately began the discovery process, serving defendants with written interrogatories, demands for production of documents, and notices to take depositions. Defendants were initially uncooperative with plaintiff's discovery demands. Plaintiff thereafter moved before the Law Division to obtain discovery relief. It was in response to plaintiff's discovery motion that defendants first moved to compel enforcement of the arbitration provisions in the contract.
On November 27, 2007, Ms. Azzaro, as proposed administrator ad prosequendum and administrator for the estate of Pasquale Azzaro, filed a complaint against Alterra and other unidentified individuals alleging negligence, statutory violations of N.J.S.A. 30:13-1 to -17, wrongful death, and breach of contract.[5] The legal action sought compensatory damages, punitive damages, wrongful death damages, and statutory attorneys fees and costs.[6] The complaint asserted that defendants' inadequate care of Mr. Azzaro while he was a resident at Clare Bridge caused him to suffer severe injuries, ultimately leading to his death.[7] In contrast to the procedural posture of the Ruszala suit, defendants filed a motion in lieu of an answer, seeking to compel the enforcement of the arbitration provision.
The court denied defendants' motions without prejudice and directed the parties to conduct discovery "on issues pertaining to the issue of interstate commerce and the validity of the arbitration clause." The Ruszala suit was pending at the time the court issued this order.
Although the Ruszala and Azzaro cases had not been consolidated, the trial court recognized that they both shared a common, possibly dispositive question of law. The judge hearing defendants' motion to compel arbitration thus decided to hear and decide the matters in one comprehensive opinion. After considering the arguments of counsel and the limited record developed, the court denied defendants' motion to compel arbitration, finding several *815 grounds to invalidate the arbitration and limitation of liability provisions of the residency agreements.
As a threshold issue, the trial court found these provisions to be "void, unenforceable[,] and contrary to public policy" because they "restrict[ed] the options available to residents for the resolution of claims involving negligence or malpractice, contrary to [N.J.S.A. 30:13-1-17]." In this context, the court found it unnecessary to reach the questions of whether Ms. Azzaro had the authority to waive her husband's rights or whether either plaintiff had properly waived their statutory rights under this act.
The court rejected defendants' argument that the FAA preempted the restrictions placed on arbitration of negligence and malpractice claims by our State's Nursing Home Responsibilities and Rights of Residents act. Relying on the rationale articulated in Bruner v. Timberlane Manor Ltd. Partnership, 155 P.3d 16 (Okla. 2006), the court found that the facts of these cases indicated a de minimus presence of interstate commerce, thus rendering the FAA inapplicable.
Finally, the court held that, even if the FAA applied, generally accepted contract principles precluded enforcement of the arbitration and limitation of liability provisions as unconscionable, based on the four factors established by our Supreme Court in Rudbart and applied in Muhammad. These factors are: "[1] the subject matter of the contract, [2] the parties' relative bargaining positions, [3] the degree of economic compulsion motivating the `adhering' party, and [4] the public interests affected by the contract." Rudbart, supra, 127 N.J. at 356, 605 A.2d 681.
Before applying the Rudbart factors, the trial court emphatically stated: "The subject Residency Agreements are contracts of adhesion. They were presented as take-it-or-leave-it, in standardized print form, with little to no opportunity to negotiate." With this conclusion firmly in place, the trial court found the Residency Agreements involved a "particularly vulnerable population that requires special protections." The "unequal bargaining power" between the parties, in the court's view, was "self-evident." Without specific reference to the personal circumstances of either of the two decedents, the court found "clear economic compulsion driving an assisted living resident to enter into this agreement."
As to the question of the public interests involved, the trial court found that "deter[ring] abuse and neglect in assisted living facilities and nursing homes" was an important factor in ensuring the ability to sue for malpractice or negligence. In the court's view, the cap on compensatory damages, the prohibition on punitive damages, and the limitation of depositions to those of only experts constituted unconscionable restrictions of a resident's right to sue, and thus, violated the public interest at issue.
Based on these findings and conclusions of law, the trial court denied defendants' motion to compel arbitration.

IV
We begin our analysis by addressing the trial court's ruling that the FAA does not apply to these two cases because defendants have not shown that the operation of these facilities substantially affects interstate commerce. Plaintiffs argue that the court correctly applied the holding in Bruner, supra, 155 P.3d 16, to find no nexus between interstate commerce and the two facilities operated by Alterra.
The trial court gave the following explanation for holding that the FAA is not *816 applicable to these two nursing home agreements:
Here, the court does not find the presence of interstate commerce. While assisted living services may constitute economic activity, the general practice of assisted living services is not subject to federal control under the Commerce Clause. The Medicare and Medicaid statutes by which Congress regulates this activity were enacted pursuant to Congress' Spending Power, and not its Commerce Power. Additionally, assisted living services, when taken in the aggregate, do not have a substantial impact on interstate commerce. Finally, the case-specific facts here are that the defendants purchased supplies from out-of-state vendors, that these supplies were purchase[d] using mail, e-mail, telephone and facsimile transmissions, that the supplies are shipped over state lines, and that approximately ten percent of the residents at Sterling House at Florence and eleven percent of the residents at Clare Bridge of Westampton are eligible for Medicaid. See Affidavit of Timothy Cesar. On this record, these case-specific facts result in only a de minimus impact on interstate commerce, insufficient to trigger FAA preemption. As such, assisted living services, taken in the aggregate, do no[t] establish an interstate commerce connection that triggers FAA preemption of the Residents Rights Act.
We disagree. Section 2 of the FAA provides that:
A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
[9 U.S.C.A. § 2 (emphasis added).]
Under this section, the FAA preempts any state law purporting to invalidate an arbitration agreement "involving interstate commerce." Young v. Prudential Ins. Co. of Am., 297 N.J.Super. 605, 616, 688 A.2d 1069 (App.Div.), certif. denied, 149 N.J. 408, 694 A.2d 193 (1997). Section 1 of the FAA further defines "commerce" to include "commerce among the several States." 9 U.S.C.A. § 1.
The United States Supreme Court has interpreted the term "involving commerce" to be the "functional equivalent of the . . . term `affecting commerce[,]' . . . provid[ing] for the enforcement of arbitration agreements within the full reach of the Commerce Clause." Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56, 123 S.Ct. 2037, 2039, 156 L.Ed.2d 46, 51 (2003). (internal quotations omitted); see also Alfano v. BDO Seidman, LLP, 393 N.J.Super. 560, 574, 925 A.2d 22 (App.Div.2007) (explaining that contracts involving commerce should be broadly construed to extend the FAA's application to the limits of Congress' Commerce Clause power).
The Court in Citizens Bank established that "the FAA encompasses a wider range of transactions than those actually. . . within the flow of interstate commerce." Citizens Bank, supra, 539 U.S. at 56, 123 S.Ct. at 2040, 156 L.Ed.2d at 51 (internal quotation omitted). Pursuant to Congress' Commerce Clause power, the FAA will reach transactions "in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice subject *817 to federal control."[8]Ibid. (internal quotations omitted).
In Alfano, we held that "[a] nexus to interstate commerce is found when citizens of different states engage in the performance of contractual obligations in one of those states because such a contract necessitates interstate travel of both personnel and payments." Alfano, supra, 393 N.J.Super. at 574, 925 A.2d 22. That case clearly involved interstate commerce because the transactions at issue occurred between a New Jersey resident and a German corporation in a New York office and involved international investments. Ibid.
The facts in Crawford v. West Jersey Health Systems, 847 F.Supp. 1232, 1240 (D.N.J.1994), are more applicable to the facts before us here. Crawford involved a contract between a New Jersey doctor and a New Jersey hospital that treated Pennsylvania patients, was "paid through out-of-state or multi-state insurance carriers," and "receive[d] goods and services from numerous out-of-state vendors." Ibid. Because the plaintiff's employment "facilitated defendants' interstate business activities," the court found that her employment agreement involved interstate commerce. Ibid.
A similar approach was adopted by the Law Division in Bleumer v. Parkway Insurance Co., 277 N.J.Super. 378, 649 A.2d 913 (Law Div.1994). Confronted with facts similar to Crawford, the court found that a contract regarding a New Jersey resident employed by a New Jersey insurance company "involve[d] or affect[ed] interstate commerce" because policyholders inevitably suffered accidents outside of the state and the insurance company had to supervise its employees while they investigated and resolved those claims outside of the state. Id. at 390-91, 649 A.2d 913.
The affidavit of Alterra's Vice President for Legal contains the only competent evidence concerning Alterra's business activities and their impact on interstate commerce. He avers that Sterling House and Clare Bridge purchase supplies, such as food, medicine, and medical equipment, "primarily from out-of-state vendors" through "mail, electronic mail, telephone, and facsimile transmissions." The vendors include the Sysco Corporation, located in Texas; Medline, in Illinois; and Direct Supply, in Wisconsin. Alterra and Brookdale are out-of-state corporations and both Sterling House and Clare Bridge accept out-of-state residents.
Clearly these nursing home facilities cannot function without the materials procured from these out-of-state suppliers. The delivery of these goods from their points of origin to the doors of these facilities thus "affects" interstate commerce and involves the federally regulated industry of interstate transportation. Further, these companies are incorporated in a foreign jurisdiction and they admit residents who originally resided outside of this State.
When these facts are viewed through the prism of the Commerce Clause and the FAA, there is little doubt that the residency agreements at issue here involve interstate commerce. Finally, although plaintiffs' individual residency agreements may not have had a specific affect upon interstate commerce, the facilities' economic activities, in the aggregate, represent a general practice subject to federal control, rendering the arbitration provisions subject to the FAA. We thus hold that the *818 arbitration provisions in the residency agreements attributable to plaintiffs are subject to the FAA.

V
We must next determine the legal ramifications which flow from our conclusion that the FAA applies to the challenged arbitration provisions.

The Residents' Rights Act
In 1976 the New Jersey Legislature passed the "Nursing Home Responsibilities and Rights of Residents" act (the Act), N.J.S.A. 30:13-1 to -17, in an effort "to ameliorate the harsh conditions of the elderly in nursing homes[.]" In re Conroy, 98 N.J. 321, 377, 486 A.2d 1209 (1985).[9] The Act imposes certain responsibilities on nursing homes, N.J.S.A. 30:13-3, and declares the "[r]ights of nursing home residents," N.J.S.A. 30:13-5. These rights include a right to "considerate and respectful care that recognizes the dignity and individuality of the resident," and a right "[n]ot [to] be deprived of any constitutional, civil[,] or legal right solely by reason of admission to a nursing home." N.J.S.A. 30:13-5(j), (m).
N.J.S.A. 30:13-8 creates a private cause of action for damages for "[a]ny person or resident whose rights . . . are violated [under the Act] . . . against any person committing such violation." N.J.S.A. 30:13-8 a. Regulations promulgated under the Act create corresponding standards for assisted living residences, comprehensive personal care homes, or assisted living programs. N.J.A.C. 8:36-1.1 to -23.
In 2003, the Legislature amended the Act to include the following provision:
[a]ny provision or clause waiving or limiting the right to sue for negligence or malpractice in any admission agreement or contract between a patient and a nursing home or assisted living facility licensed by the Department of Health and Senior Services pursuant to the provisions of P.L. 1971, c. 136 (C. 26:2H-1 et seq.), whether executed prior to, on or after the effective date of this act, is hereby declared to be void as against public policy and wholly unenforceable, and shall not constitute a defense in any action, suit or proceeding.
[N.J.S.A. 30:13-8.1.]
Under § 2 of the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. The FAA thus preempts any state law or regulation that seeks to preclude the enforceability of an arbitration provision on grounds other than those which "exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2; see also Martindale v. Sandvik, Inc., 173 N.J. 76, 85, 800 A.2d 872 (2002).
Our State's prohibition of arbitration agreements in nursing home contracts, designed to protect the elderly, is thus irreconcilable with our national policy favoring arbitration as a forum for dispute resolution. Under our federal system of government, national policy prevails. Therefore, the FAA's clear authorization nullifies the specific prohibition of arbitration *819 provisions in nursing home or assisted living facilities' contracts contained in N.J.S.A. 30:13-8.1.

Contract Law Defenses
It is now well-settled that general "contract [law] defenses, such as fraud, duress, and unconscionability may be invoked to invalidate an arbitration agreement without contravening § 2" of the FAA. Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902, 909 (1996). Our Supreme Court also recognized this general principle in Muhammad, supra, 189 N.J. at 12, 912 A.2d 88. Thus, even though the FAA preempts the specific anti-arbitration provision in N.J.S.A. 30:13-8.1, the trial court held that the arbitration provisions in the residency agreements were unenforceable under the doctrine of unconscionability.
Plaintiffs urge us to adopt the court's reasoning in this respect. Defendants argue that the arbitration provisions are, as a whole, not unconscionable. However, even if some sections of the arbitration clause were deemed legally unsustainable, defendants contend that the remedy should be severance, not outright invalidation of the entire arbitration clause.
The trial court's analysis of the unconscionability question is inextricably linked to its threshold determination that the residency agreement, including the arbitration provision, is a contract of adhesion. From this analytical foundation, the court then examined the particular features and restrictions in the arbitration provision and ultimately found them overbearing and unconscionable. Thus, we must first determine whether the record supports the trial court's finding that the residency agreement, including the arbitration provision, is a contract of adhesion that evidences indicia of procedural unconscionability.
As explained by the Court in Muhammad, procedural unconscionability involves a "variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." Muhammad, supra, 189 N.J. at 15, 912 A.2d 88. Moreover, "adhesion contracts invariably evidence some characteristics of procedural unconscionability." Id. at 16, 912 A.2d 88. A contract of adhesion "is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the `adhering' party to negotiate except perhaps on a few particulars." Rudbart, supra, 127 N.J. at 353, 605 A.2d 681.
Here, although age as a factor weighing in favor of procedural unconscionability is undisputed, the remaining indicia of procedural unfairness are simply not part of the record developed before the trial court. We have a limited account from Ms. Azzaro about what transpired during her meeting with the representative of Alterra. We do not know, however, anything about her or her husband's level of education or sophistication in legal matters. The record with respect to Ruszala is even more sparse. Although courts have employed a "sliding scale" analysis when considering, in tandem, the two factors of procedural and substantive unconscionability, Muhammad, supra, 189 N.J. at 16 n. 3, 912 A.2d 88, the absence of evidence showing procedural unconscionability does not undermine our ultimate conclusion that the identified restrictions are substantively unconscionable.
However, we are satisfied that the residency agreements are contracts of adhesion. The first time Ms. Azzaro met with an Alterra representative was one week before her husband was admitted to Clare Bridge. The purpose of the meeting *820 was to inform the potential resident and his family about the services available at the facility. From this encounter, Ms. Azzaro was left with the "understanding that this document was a form document that was part of the admission process and that it could not be changed in any way."
Although Ms. Azzaro did not elaborate or explain how she arrived at this "understanding," the residency agreement itself supports her view. Both Azzaro's and Ruszala's documents are in a standardized printed form and, on their face, give no indication that any of the terms are negotiable. Further, although defendants argue that plaintiffs were "encouraged to discuss this Agreement with an attorney," there is nothing in the record to suggest that any of the provisions in the agreement were negotiable or could have been modified or deleted by the residents as a result of arms-length good faith negotiations. Finally, these exact agreements were found to be adhesion contracts by the District Court for the Eastern District of Pennsylvania. Ostroff v. Alterra Healthcare Corp., 433 F.Supp.2d 538, 544 (E.D.Pa.2006). We thus affirm the trial court's determination that the residency agreements are contracts of adhesion.
As noted by the Court in Rudbart, and reaffirmed in Muhammad, however, the determination that a contract is one of adhesion represents only the first step in the analysis "into whether a contract, or any specific term therein, should be deemed unenforceable based on policy considerations." Muhammad, supra, 189 N.J. at 15, 912 A.2d 88. To determine substantive unconscionability, we must next look to and apply the four factors set forth by the Court in Rudbart: "[1] the subject matter of the contract, [2] the parties' relative bargaining positions, [3] the degree of economic compulsion motivating the `adhering' party, and [4] the public interests affected by the contract." Rudbart, supra, 127 N.J. at 356, 605 A.2d 681.
We start with factor one, the subject matter of the contract. Although the FAA preempts that portion of the Act which renders unenforceable arbitration provisions in residency agreements for nursing home and assisted living facilities, the other sections of the Act which protect the elderly and infirm remain legally viable. As noted by the trial court, in passing these laws, the Legislature recognized the need to protect a discrete class of citizens who, by virtue of their age and infirmity, are particularly vulnerable to sharp commercial practices, especially in the area of health care, housing, and end-of-life decisions.
The second and third prongs under Rudbart concern the parties' relative bargaining positions and "the economic compulsion motivating the adhering party." The only specific information we have relevant to these considerations is: (1) plaintiffs are not Medicaid eligible; (2) the monthly residency fee is $5,000; and (3) Mizerak received a "loyalty discount" as consideration for agreeing to sign the residency contract.
There are, however, certain global characteristics that every potential nursing home resident shares. These consumers are, by definition, unable to continue to live in their homes due to ill health, advanced age, or both. Beyond this profile, the Legislature has identified these individuals as a uniquely vulnerable group of consumers, entitled to special protection against economic abuse,[10] personal privacy *821 abuse,[11] the deprivation of their right to choose their own healthcare professionals,[12] and an array of other abuses that speak to the core of human dignity.[13] These statutory protections highlight the disparity in economic resources between these particular consumers and the owners and operators of these specific facilities. This imbalance of resources invariably creates a relative inferiority in bargaining position for such individuals.
The unconscionability issue in this matter centers on the limitations of discovery, the capping of compensatory damages to a seemingly arbitrary figure, and the outright prohibition of punitive damages. In determining whether these restrictions run counter to our State's public policy, we need look no further than to the plain language in N.J.S.A. 30:13-8.1:
Any provision or clause waiving or limiting the right to sue for negligence or malpractice in any admission agreement or contract between a patient and a nursing home or assisted living facility licensed by the Department of Health and Senior Services . . . whether executed prior to, on or after the effective date of this act, is hereby declared to be void as against public policy and wholly unenforceable, and shall not constitute a defense in any action, suit or proceeding.
Although the FAA preempts the application of this statute to bar arbitration as a contractually provided means of dispute resolution, the statute otherwise continues to protect these consumers' right to sue. With this in mind, we turn our attention back to the analysis of the fourth prong under Rudbart.
The fourth prong under Rudbart concerns the public interests affected by the contract. As the Court noted in Muhammad, supra, this is "the most important [factor] to the present analysis [because it] considers the public interests affected by the contract." 189 N.J. at 19, 912 A.2d 88. This factor requires us to determine whether the effect of the arbitration clause provisions that significantly restrict discovery, limit compensatory damages, and prohibit punitive damages "shield defendants from compliance with the laws of this State." Ibid.
The discovery restrictions are arguably the most palpably egregious because they are clearly intended to thwart plaintiffs' ability to prosecute a case involving resident abuse. Under these restrictions, a plaintiff cannot depose any of the nursing home staff members who are directly responsible for the day-to-day care of the resident. Indeed, no depositions can be taken of any fact witness, including individuals without any particular affiliation to the nursing home who, nevertheless, may have witnessed an act of abuse or neglect or may have information material to the case. This limitation is thus clearly inconsistent with the protection provided in N.J.S.A. 30:13-8.1.
The limits on compensatory damages have the insidious effect of permitting nursing home operators to budget potential liability as a mere cost of doing business, leaving seriously injured residents unable to obtain the full measure of relief warranted by the evidence. This section of the arbitration clause is likewise unenforceable under N.J.S.A. 30:13-8.1.
The preclusion of punitive damages touches upon the societal interest of expressing the community's disapproval of outrageous conduct. In the context of *822 nursing home abuse, punitive damages also serve an "admonitory" function. Fischer v. Johns-Manville Corp., 103 N.J. 643, 657, 512 A.2d 466 (1986). As Justice Coleman explained in Fischer,
[punitive damages] have been described as a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine. They are awarded to punish the wrongdoer, and to deter both the wrongdoer and others from similar conduct in the future. The doctrine of punitive damages survives because it continues to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice.
[Ibid. (internal quotations and citations omitted).]
When considered together, the restrictions on discovery, limits on compensatory damages, and outright prohibition of punitive damages form an unconscionable wall of protection for nursing home operators seeking to escape the full measure of accountability for tortious conduct that imperils a discrete group of vulnerable consumers. This is precisely the evil the Legislature sought to enjoin by passing N.J.S.A. 30:13-8.1. We thus hold that these provisions in the arbitration clause of the residency agreement are void and unenforceable under the doctrine of substantive unconscionability.[14]
As was the case in Muhammad, our ruling does not focus solely on plaintiffs' ability to individually vindicate their common law rights to obtain complete and fair compensation for their alleged injuries. Our consideration of "the public interests affected by the contract" under Rudbart compels a broader inquiry into how the identified restrictions affect our State's public policy of protecting a vulnerable and discrete class of consumers. Muhammad, supra, 189 N.J. at 25, 912 A.2d 88.
Finally, this limited record precludes us from determining whether Ms. Azzaro had actual or implied authority to execute the residency agreement on behalf of her late husband. This question must be presented to the trial court for resolution because it is necessary to determine whether a valid contract was ever formed and executed by the parties. Muhammad, supra, 189 N.J. at 12, 912 A.2d 88; see also N.J.S.A. 2A:23B-6(b). We therefore remand the Azzaro matter to the trial court for consideration of this threshold issue.

VI
As the Court did in Muhammad, the remedy here is to enforce our federal policy in favor of arbitration, while excising the unconscionable restrictions that we have concluded are unenforceable under N.J.S.A. 30:13-8.1. We thus sever the restrictions on discovery and remand for the parties to present their case to an arbitrator governed by our civil rules of discovery as provided for in the arbitration agreement. We further invalidate the $350,000 limitation on compensatory damages and the bar against punitive damages. The *823 arbitrator will determine the measure of damages based on the evidence presented, uninhibited by any per se limitations on compensatory damages; punitive damages may also be assessed if warranted.
By way of summary, we reverse the trial court's ruling finding the FAA inapplicable to these agreements. However, we affirm the court's determinations that these contracts are ones of adhesion and that certain restrictions in the arbitration clauses of the residency agreements are substantively unconscionable. We thus sever the offending provisions and remand the Ruszala case for immediate adjudication before an arbitrator. Finally, we remand the Azzaro matter to the trial court to determine whether a valid contract was formed between the parties.
NOTES
[1] This information is taken from an affidavit submitted by Alterra's Vice President of Legal to the trial court in support of defendants' motion to compel arbitration.
[2] Neither resident involved in this litigation received funding through Medicaid or Medicare.
[3] Although not entirely clear from the record, it appears that Mizerak was Ruszala's niece.
[4] The affiant also indicated that "[n]ew residents at Clare Bridge . . . and other Alterra Healthcare Corp. facilities, and those who refused to sign the Residency Agreement rolled out in April 2004, did not receive the loyalty discount."
[5] Ms. Azzaro withdrew the claim for breach of contract at the motion to compel arbitration hearing.
[6] Pursuant to N.J.S.A. 30:13-8(a), any person or resident of a nursing home whose rights under the statute have been violated "shall have a cause of action against any person committing such violation." In addition to recovering "actual and punitive damages," the statute further provides that "[a]ny plaintiff who prevails in any such action shall be entitled to recover reasonable attorney's fees and costs of the action."
[7] The record indicates that Mr. Azzaro "suffered. . . an acute subdural hematoma due to trauma[.]"
[8] In Citizens Bank, the Court further clarified that the Court's decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which placed some limits on Congress' Commerce Clause power, "did not restrict the reach of the FAA . . . over concededly economic activity[.]" Id. at 58, 123 S.Ct. at 2040, 156 L.Ed.2d at 52-53.
[9] In 1977, the Legislature established additional protections for the elderly through the creation of the Office of the Ombudsman for the Institutionalized Elderly. See N.J.S.A. 52:27G-1. This statute was amended in 1983 to create further safeguards because "elderly patients in certain institutions or care facilities have been subjected to either physical or mental abuses [that have] either gone unreported or came to light many months later when it was too late to take official action." In re Conroy, supra, 98 N.J. at 379, 486 A.2d 1209.
[10] See N.J.S.A. 30:13-4.1, setting strict guidelines for the investment and disposition of nursing home security deposits; see also N.J.S.A. 30:13-5(a), preserving the right of nursing home residents to manage their own financial affairs.
[11] N.J.S.A. 30:13-5(b)-(f).
[12] N.J.S.A. 30:13-5(g).
[13] N.J.S.A. 30:13-5(h)-(n).
[14] We note that under Section V(A)(11) of the arbitration clause, the parties are equally responsible for fees and costs associated with the arbitration, unless the resident party is proven indigent. This may constitute a significant economic impediment to the prosecution of cases involving resident abuse. Section V(A)(11) also prohibits the resident from recovering attorney fees and costs. This provision appears to run afoul of the explicit language in N.J.S.A. 30:13-8(a), which allows any prevailing plaintiff to recover counsel fees and costs. We decline to address these issues, however, because they were not raised by the parties in this appeal. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973).