**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2223-20

VINCENT STEVEN ONDROF,
through LAURIE ADAMSKI,
power of attorney,

     Plaintiff-Respondent,

v.

CSL SUMMIT, LLC, d/b/a SPRING
MEADOWS SUMMIT, CAPITAL
SENIOR LIVING PROPERTIES,
INC.,[1] WELLTOWER NNN
GROUP, LLC, CSL SM SUMMIT,
LLC, CAPITAL SPRING
MEADOWS, LLC,[2] and CAPITAL
SENIOR LIVING CORPORATION,[3]

     Defendants-Appellants.

_____

Argued September 21, 2021 – Decided November 15, 2021

Before Judges Fisher and DeAlmeida.

---

[1] Improperly pleaded as "Living Properties Capital Senior."
[2] Improperly pleaded as "Meadows LLC Capital Spring."
[3] Improperly pleaded as "Living Corp. Capital Senior."

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No L-2063-19.

Michael R. Ricciardulli argued the cause for appellants (Ruprecht, Hart, Ricciardulli & Sherman, LLP, attorneys; Michael R. Ricciardulli, of counsel and on the briefs; Brion D. McGlinn, on the briefs).

Jonathan F. Lauri argued the cause for respondent (Stark & Stark, PC, attorneys; Jonathan F. Lauri, of counsel and on the brief).

PER CURIAM

Plaintiff Vincent Steven Ondrof commenced this action, alleging defendants (hereafter "Spring Meadows"), a Summit assisted living facility in which he resides, provided negligent care and caused him personal injuries.[4] Spring Meadows claims the existence of an enforceable arbitration agreement, alluding to such provisions among the many documents Ondrof either signed or which were signed on his behalf, even though the inclusion of an arbitration agreement in such a contract violates New Jersey law. See N.J.S.A. 30:13-8.1 (declaring that "[a]ny provision or clause waiving or limiting the right to sue for negligence or malpractice in any admission agreement or contract between a

---

[4] Ondrof alleges all the named defendants are the owners and operators of an assisted living facility on Springfield Avenue in Summit in which he resided and was allegedly negligently cared for. We need not attempt to ascertain which one or more than one of these defendants is the owner and operator and only, for convenience sake, do we refer to defendants collectively as Spring Meadows.

patient and . . . [an] assisted living facility . . . is hereby declared to be void as against public policy and wholly unenforceable").[5] Spring Meadows was unable to convince the trial judge to stay the action and compel arbitration, and now appeals, as of right, arguing the trial judge erroneously: (1) "relied on the absence of a power of attorney" in concluding Ondrof's daughter – Laurie Adamski – did not have authority to bind him to the clauses that called for the waiver of a jury trial and mandatory arbitration; (2) failed to apply equitable doctrines that would preclude Ondrof from claiming the arbitration agreement is unenforceable; and (3) failed to recognize that Ondrof's "signature to the

---

[5] We are mindful that when a party seeks to compel arbitration, the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1-16, when applicable, negates the significance of N.J.S.A. 30:13-8.1. That is, when the FAA applies to an arbitration agreement – and we assume only for the moment that it applies here despite the lack of an obvious federal interest – a contrary state policy against enforcement of an arbitration agreement in the context of a nursing home or assisted living facility will have no effect. See Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530, 533 (2012); Kleine v. Emeritus at Emerson, 445 N.J. Super. 545, 547 (App. Div. 2016); Estate of Ruszala v. Brookdale Living Cmtys., Inc., 415 N.J. Super. 272, 292-93 (App. Div. 2010). But, contrary to Spring Meadows' responses to our inquiries during oral argument, the FAA did not remove N.J.S.A. 30:13-8.1 from our statutory law. And the FAA has not been shown to have altered our lawmakers' hostile view toward agreements like this. It only makes New Jersey's policy ineffectual when considering whether to enforce an arbitration agreement governed by the FAA. Facilities, like Spring Meadows, that fall within the ambit of N.J.S.A. 30:13-8.1, remain bound to its prohibition and we would think they run the risk of other ramifications when violating New Jersey law by extracting such agreements from their clients. See Kleine, 445 N.J. Super. at 548 n.5.

A-2223-20

agreement was binding upon him, separate and apart from . . . Adamski's signature." Because we find from the record a genuine factual dispute surrounding the formation and content of the parties' contractual undertaking, we vacate the order denying Spring Meadows' motion and remand for an evidentiary hearing to determine the enforceability of the agreement on which Spring Meadows relies.

I

To explain, we start with (a) a brief recitation of some undisputed, relevant facts, and then describe (b) the contract documents in question and what was and wasn't executed by the parties, as well as (c) a description of the parties' factual disputes about contract formation, and lastly provide (d) a brief description of the trial judge's holding.

A

Ondrof was seventy-six years old in 2016 when he fell and sustained injuries in his home.

While Ondrof was recovering in a rehabilitation center, his daughter, Adamski, explored alternative future living arrangements on her father's behalf and, in that regard, met with Donna Brito, Spring Meadows' executive director.

A-2223-20

B

At some point, Brito presented Adamski with contract documents, including those labeled: "responsible party agreement," "residence and service agreement," "binding arbitration agreement," and "resident signature page," among others. The entire collection of documents consisted of forty-seven pages.

The "responsible party agreement" declares, among other things, that:

- Spring Meadows "prefers" that the resident appoint a power of attorney to serve as the responsible party to handle the resident's funds, execute documents and participate in care decisions;

- by signing the "Residence and Service Agreement and/or this Responsible Party Agreement," the responsible party "acknowledges" that he or she "has been authorized" by the resident, "or designated by law, to enter into and bind" the resident to the residence and service agreement;

- the responsible party "acknowledges and agrees that [he or she] is executing the Residence and Service Agreement (including the Binding Arbitration Agreement) and Responsible Party Agreement in individual and representative capacities"; and

A-2223-20

- by executing, the signer "understands and acknowledges" that Spring Meadows is "relying upon the above warranties, representations, and agreements in admitting" the resident, and if the warranties and representations "are not true, or if the above agreements are not complied with," Spring Meadows "will have detrimentally relied upon them and . . . will suffer financial harm and loss."

This "responsible party agreement" is undated. It is signed by Adamski and Brito. Ondrof's signature does not appear on this document.

The "binding arbitration agreement" is five pages long. Above its title[6] is the phrase "Attachment I,"[7] suggesting it may have been intended to be part of something else to which it would eventually be appended. In large letters this document instructs that it should be read "carefully" and recommends the signing party "consult with an attorney, family, and/or friends before choosing to sign." In broad language, the document expresses that, by signing, the parties agreed to arbitrate "any action, dispute, claim or controversy of any kind . . . arising out of the provision of goods, services or items provided under the terms

---

[6] We assume the title "binding arbitration agreement" was intended to convey that, by signing, the parties agreed to "binding arbitration," not that their arbitration agreement is "binding."

[7] To be clear, this attachment designation is not Roman numeral I but the letter I, as revealed by the fact that the responsible party agreement is designated attachment G.

A-2223-20

of this or any other agreement between the [p]arties, or any other dispute involving acts or omissions that cause damage or injury to either [p]arty. . . ." Also in large print, the document states that, by signing, the parties:

> ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM OR DISPUTE DECIDED IN A COURT OF LAW OR EQUITY BEFORE A JUDGE AND/OR JURY.

Adamski and Brito signed this document and dated it October 6, 2016, even though they dispute the date it was signed. Ondrof's signature does not appear on this five-page document.

The text of the "resident signature page" states that "[t]he undersigned each acknowledge that he/she has received the Residence and Service Agreement and all Attachments and each understands and voluntarily agrees to all of the terms contained herein." This is the only document containing Ondrof's signature.

Adamski signed the "resident signature page" as the "resident's responsible party"; in that location, the document anticipates the signer's checking of one of a number of boxes labeled: "Guardian/Conservator," "Power of Attorney/Health Care Agent," "Spouse," and "Other." Adamski checked "[o]ther" and wrote the word "daughter" alongside. Brito signed for Spring Meadows as its "authorized agent"; in the box containing her signature is an

unchecked box which states: "Resident or Responsible Party must also sign Attachment I (Binding Arbitration Agreement)." The document states that Ondrof and Adamski signed this page on October 2, 2016, and Brito signed on October 16, 2016.

Because Ondrof did not sign the arbitration agreement, because the parties present colorable arguments about the scope of Ondrof's signature on the "resident signature page," and because the parties dispute Adamski's authority to bind Ondrof when she signed the other documents, including the arbitration agreement, we must consider the parties' factual contentions to first determine whether Ondrof should be bound to the arbitration agreement. After careful examination of the record, we are satisfied there are numerous genuine disputes of material facts that preclude a disposition of these issues. To explain, we examine the parties' competing allegations about the execution of the documents.

C

Plaintiff's version. According to Adamski, after touring the facility, Brito presented her with the "assisted living community" form and the "resident signature page" with the comment that the latter would have to be executed before Ondrof could be admitted; Brito did not advise that this "resident

signature page" was part of a larger agreement. Adamski later presented the "assisted living community" form and the "resident signature page" to her father; they both signed it and Adamski returned these documents to Spring Meadows.

On October 6, 2016, Brito advised Adamski that she needed to sign additional paperwork before Ondrof could be admitted. The next day, Brito presented Adamski with the "residence and service agreement" and its attachments, which – at this point – included the "responsible party agreement" and the "binding arbitration agreement," all of which contained tabs at the places where a signature was required. Adamski claims Brito never explained the contents of these documents, some of which, including the "binding arbitration agreement," had not been previously provided. Adamski signed her own name where indicated; Ondrof signed none of these. Relying on these facts, Ondrof argues he never agreed to arbitrate.

On whether her signature could bind Ondrof, Adamski asserted that Brito was well aware that she then did not possess a power of attorney for her father. Indeed, according to Adamski, Brito had recommended Adamski thereafter obtain a power of attorney, which Adamski obtained, but not until three months had passed.

A-2223-20

Spring Meadows' version. Spring Meadows disputes the facts urged by Ondrof. Spring Meadows claims both Ondrof and Adamski were present during the initial meeting with Brito in early October 2016. At that time, according to Brito, she gave them both a blank copy of the "residence and service agreement," with all the other documents appended, so they could review the entire contract before signing. Brito claims both Ondrof and Adamski later returned to sign and that Adamski advised she held Ondrof's power of attorney.[8] Brito claims to have explained the contractual documents and answered Ondrof's and Adamski's questions. She claimed she did not seek or obtain Ondrof's signature on all the documents because Ondrof told Adamski, in their presence, that Adamski could sign for him. Spring Meadows offered no explanation why – if Ondrof then and there authorized Adamski to sign for him – he would have then signed the "resident signature page" or why Ondrof's signature did not bear the date of this alleged meeting.

D

---

[8] Brito acknowledged that she did not receive the power of attorney from Adamski until January 2017. She claimed that she did not sufficiently review in January 2017 the power of attorney and, thus, did not learn that Adamski did not hold a power of attorney during the earlier October events.

A-2223-20

We discern from his opinion that the linchpin to the judge's refusal to enforce the arbitration agreement in light of these conflicting factual allegations was a combination of the absence of Ondrof's signature on that particular document, Ondrof's undisputed competence to execute agreements, and the absence of a power of attorney in favor of Adamski at that point in time. In the last respect, the judge alluded to and relied on N.J.A.C. 8:36-4.1(a)(18), which declares that a resident of an assisted living facility has:

> The right to manage his or her own finances or to have that responsibility delegated to a family member, an assigned guardian, the facility administrator, or some other individual with power of attorney. The resident's authorization must be in writing, and must be witnessed in writing.

From this the judge concluded that in the absence of a power of attorney, Adamski was powerless to bind Ondrof.

II

In appealing the interlocutory order as of right, R. 2:2-3(a), Spring Meadows contends the trial judge mistakenly relied on the absence of a power of attorney, failed to equitably or judicially estop Ondrof and Adamski from arguing the absence of Adamski's authority, and failed to find that Ondrof's signature on one of the handful of documents was enough to bind him to the others.

11

In considering whether to enforce an arbitration agreement, a court must first apply state law principles in determining whether there was an agreement to arbitrate. That is, "arbitration is a matter of contract," Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67 (2010), and there should be a resort to state contract law principles when ascertaining whether the parties had a meeting of minds, Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 442-44 (2015); see also Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 137 (2020). Put more plainly, the policy favoring arbitration has no application when parties haven't agreed to arbitrate. Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989); Atalese, 219 N.J. at 442. After close review of the parties' competing versions of the events encircling the formative stage of whatever they had agreed on, we are satisfied there are factual disputes that are so material that there must be an evidentiary hearing to resolve whether Ondrof on his own or through an authorized representative agreed to arbitrate any disputes with Spring Meadows. And so, we reject both Spring Meadows' argument that the record demonstrates the enforceability of the arbitration agreement and Ondrof's argument that the record lacks an enforceable arbitration agreement.

To be sure, the uncertainty surrounding the parties' interactions is largely a product of Spring Meadows' attempt to secure a binding agreement through a

series of contractual documents rather than a process by which it presented one contract at one time for execution. While it is not our role or desire to instruct an assisted living facility on how to go about extracting enforceable arbitration agreements from its clientele, it certainly wasn't helpful to Spring Meadows' cause that it went about obtaining such an agreement by proposing the execution of a series of documents rather than a single, understandable, and fully-integrated contract for execution.

The same holds true for the parties' disputes about the presence or extent of Adamski's authority to speak for or bind her father to any of the contract documents presented by Spring Meadows. It is noteworthy that Spring Meadows' own documents express a preference that the resident issue a power of attorney for someone to act on his behalf. Yet, by failing to ensure Adamski was sufficiently empowered, Spring Meadows was relegated to an attempt to persuade the court on a less than certain record that Adamski had sufficient authority to bind Ondrof to an agreement to arbitrate. The contract documents themselves demonstrate the absence of clarity and the need for a plenary hearing. As we noted, from the options on the "resident signature page" for identifying her relationship to the resident, Adamski chose "other," not "power-of-attorney," and described herself as "daughter." Unless and until Spring

13

Meadows can demonstrate at the plenary hearing that Adamski had far greater authority than whatever authority a daughter may have over a father, defendant's argument that Adamski's signing as Ondrof's daughter was sufficient authority to bind Ondrof must fail. We are cognizant that other material in the executed contract documents may suggest an expression of a greater authority, but the weight to be given to such expressions must await an illumination of the parties' intentions to be explored at the plenary hearing for which we remand. We view in this same vein Spring Meadows' argument that because Ondrof signed one of the documents he conveyed his consent to all the stipulations in all the other documents.[9] The lack of his signature on other documents – most notably the

---

[9] Indeed, the very language of the "resident signature page," which is the only document Ondrof signed, does not necessarily capture and incorporate all the language in the other documents including – most importantly – the arbitration agreement. That is, the "resident signature page" did not restate in sufficient language the agreement stated elsewhere about arbitration; this particular page stated only that by signing Ondrof "acknowledge[s] . . . he . . . has received the Residence and Service Agreement and all Attachments and . . . understands and voluntarily agrees to all of the terms contained herein." Spring Meadows' argument requires numerous leaps of logic that would at least incorporate: (a) an assumption that Ondrof was aware that an arbitration agreement was incorporated in the phrase "Residence and Service Agreement and all Attachments," (b) he in fact understood and voluntarily agreed to an arbitration agreement somewhere within the "Residence and Service Agreement and all Attachments," and (c) the word at the end – "herein" – should be understood as "therein." These assumptions cannot be drawn on this record. The law endorses a policy in favor of arbitration, but it does not impose on a party the requirement

arbitration agreement – raises doubt as to whether he intended to agree to arbitrate any future disputes. Again, this is another matter to be considered at the plenary hearing.

Spring Meadows also argues for the application of equitable principles in arguing Adamski's signature was sufficient to bind Ondrof or, even if it wasn't, that Spring Meadows had the right to assume Adamski was sufficiently authorized. Spring Meadows refers to both equitable and judicial estoppel principles as a bar to the position now taken against arbitration. We find Spring Meadows' judicial estoppel argument lacks sufficient merit to warrant a discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only that judicial estoppel serves to preserve the "integrity of the judicial process," Cummings v. Bahr, 295 N.J. Super. 374, 387 (App. Div. 1996), by prohibiting a party from advocating "a position contrary to a position it successfully asserted in the same or a prior proceeding," Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606 (App. Div. 2000) (emphasis added). Even if it could be found

---

of successfully navigating a shell game. We draw no conclusions except that, absent further evidence illuminating Ondrof's intent, the "resident signature page" alone does not support Spring Meadows' argument that Ondrof expressly agreed to arbitrate any disputes.

that Adamski had advocated a different position in this case, there is no evidence she did so successfully.

Defendant's attempt to invoke the doctrine of equitable estoppel, which may be used against a party that engaged in conduct inducing another to rely to its detriment, Knorr v. Smeal, 178 N.J. 169, 178 (2003), appears to be based on its assumptions that: Ondrof ratified the entire agreement by signing in a single place; or, in the same or similar manner, he delegated his authority to Adamski; or Adamski somehow led Spring Meadows to believe she had the authority to bind her father even though her only affirmative statement in the documents – not the language inserted in the lengthy documents to suggest greater authority – was her inserting alongside her signature that she was signing as Ondrof's "daughter."

We have already stated that we find the circumstances surrounding execution (or lack of execution) of the documents and the manner in which the parties may or may not have intended to be bound to the arbitration agreement so fraught with factual disputes and uncertainties as to require a plenary hearing. The application of equitable estoppel also cannot be applied absent the revelation of the true facts through the conducting of a plenary hearing. Spring Meadows may argue, for example, that Adamski should not be now permitted

to disavow language in one document she did sign that stated – in language drafted by Spring Meadows – that by signing on a line designated "responsible party," Adamski represented that "she has been authorized by the resident . . . to enter into and bind the resident to the Residence and Service Agreement." Even if that's what Spring Meadows places its reliance on, the judge will have to consider, among other things, whether Spring Meadows' reliance was reasonable since the quoted language does not refer to the arbitration agreement. We find it also difficult to understand – but also leave for the judge's consideration at the plenary hearing – how defendant could have <u>reasonably</u> relied on a statement from a resident's daughter, who signed only as the resident's daughter, that she had authority beyond whatever her familial relationship provided. And, it is also difficult to understand, but also left for further development in the trial court, how Spring Meadows could have reasonably relied on a statement of an alleged agent; the key question to be answered does not concern the purported agent's acts or statements but the words and conduct of the purported principal. <u>See</u> <u>Sears Mortg. Corp. v. Rose</u>, 134 N.J. 326, 337-38 (1993); <u>see also</u> <u>Restatement (Third) of Agency</u>, § 3.01 (Am. Law. Inst. 2006) (recognizing that "[a]ctual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the

agent take action on the principal's behalf"); id. at § 3.03 (recognizing that "[a]pparent authority . . . is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation"). Considering the true facts are not yet known, we need not further discuss what circumstances might or might not demonstrate either actual or apparent authority. The thrust of today's holding is not to resolve those issues but to convey that the emphasis in such an analysis is not on the signals given by the alleged agent – as constitutes much of Spring Meadows' argument – but by the signals given by the alleged principal.

In addition, it should not be overlooked that in seeking an equitable remedy like the imposition of an estoppel, it is incumbent on Spring Meadows to show that it has acted equitably. "[They] who seek[] equity must do equity." Thompson v. City of Atlantic City, 190 N.J. 359, 384 (2007). While we are mindful that N.J.S.A. 30:13-8.1 cannot stand in the way of the enforcement of an arbitration agreement subject to federal law,[10] we see nothing that prevents application of that strong public policy against what Spring Meadows seeks to

---

[10] We need not decide whether an arbitration agreement that is not governed by the Federal Arbitration Act but by the New Jersey Arbitration Act, may be held unenforceable in the face of N.J.S.A. 30:13-8.1.

do in determining whether it is equitable to estop the resident or his daughter from claiming they did not agree to arbitrate.

## III

To be clear, we decide none of the questions circling about whether Ondrof agreed to arbitrate or whether his daughter was authorized to bind him to such an agreement. We instead leave those questions to be further developed and resolved at a plenary hearing.

The order denying defendant's motion to enforce the arbitration agreement is vacated and the matter is remanded to the trial court for a plenary hearing in conformity with this opinion.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION